[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 559 
The appellant, Jimmy Tankersley, was convicted of the murder of Lillie Mae Moore and was sentenced to life imprisonment.
 I.
The appellant first contends that the trial court committed reversible error by allowing the admission into evidence of testimony that, he says, was covered by the communications-to-clergy privilege set out in Rule 505, Alabama Rules of Evidence. At trial, the State called to the stand Pastor Frankie Henderson, who was the pastor at a church the appellant attended sporadically during the few years before the murder. According to Pastor Henderson, the appellant telephoned her on three consecutive nights before Moore's murder. On the first night, the appellant revealed to Pastor Henderson that he was upset because the woman he had been seeing had broken off their relationship. According to Pastor Henderson, the appellant was "more agitated" and "very upset" the second night, saying that he knew where his former girlfriend lived and that he would watch her. Furthermore, he told Pastor Henderson that if his girlfriend did not come back to him, he would kill her. Pastor Henderson testified that she tried to dissuade the appellant from carrying out such a plan by telling him that if he killed her he would "bust hell wide open." Although Pastor Henderson tried to get the appellant to tell her his former girlfriend's name so that she could warn her, the appellant refused. On the third night, the night before Moore was killed, the appellant again told Pastor Henderson that he was watching his girlfriend. Pastor Henderson again tried to discourage him from committing any violence, telling him that just talking to his former girlfriend would be more productive.
As Pastor Henderson began testifying about the appellant's telephone conversations with her, the appellant's trial counsel insisted that she needed to be examined to determine whether the communications-to-clergy privilege applied to exclude her testimony. The trial judge overruled this first request but after another request when Pastor Henderson began testifying about the second telephone call, the court allowed counsel to ask her a few questions. Pastor Henderson stated that she believed that the appellant did not call her before Moore's murder because she was a pastor, but rather because he was upset and he "just knew that I loved him as a person." Earlier in the year he had telephoned her because he "got upset over Social Security things." She asserted that there was a difference between "talking" and "confidence." On direct examination, she had expressed, "not one time did he say, `I am talking to you as a pastor or this is a confidential conversation.'" At the end of this examination, the appellant's trial counsel objected to the admission of the substance of the telephone conversations between the appellant and Pastor Henderson on the grounds that those conversations were subject to the clergyman privilege. This objection was overruled; after Pastor Henderson testified the appellant's trial counsel moved for a mistrial.
The State argues that the clergyman privilege is not broad enough to encompass the communications between Pastor Henderson and the appellant. The State cites Lucy v. State, 443 So.2d 1335,1340-1341 (Ala.Cr.App. 1983), and Santmier v. Santmier,494 So.2d 95 (Ala.Civ.App. 1986), for the proposition that, in order to be privileged, communications with clergy must be "penitential in character." However, these cases were governed by § 12-21-166, Code of Alabama 1975, which has been superseded by the Alabama Rules of Evidence, specifically Rule 505. Although § 12-21-166 limited the clergyman privilege to communications that were either confessional or marital in nature, Rule 505 has explicitly broadened the scope of the privilege to include "all conferences where the clergyman is consulted in the professional capacity of spiritual advisor in the broadest sense." Ala. R. Evid. 505, Advisory Committee's Notes. The fact that the appellant was not penitent during his conversations with Pastor Henderson does not disqualify these conversations from the privilege. *Page 561 
The State further argues that the conversations were not privileged because, it argues, the appellant was not contacting Pastor Henderson in her capacity as a pastor. Pastor Henderson testified that the appellant did not explicitly say that he was contacting her in her capacity as a pastor but that he was contacting her because he knew that she "loved him as a person" rather than because she was a pastor. The record, however, indicates clearly that the appellant intended to contact her in her capacity as a pastor. The evidence indicated that he had always called Pastor Henderson spiritual guidance during times of distress. In State v. Boling, 806 S.W.2d 202 (Tenn.Cr.App. 1990), the trial court ruled that conversations between Boling and the preacher at the church he regularly attended were not privileged. According to the trial court in Boling, these conversations were not privileged because they "emanated from the closeness of the relationship between them as Christian friends."Id. at 203. However, the Tennessee Court of Criminal Appeals held that the conversations were privileged, focusing on the informality of the preacher's duties and his consoling and counselling of Boling. Id. at 203-204. The fact that the preacher was also acting as Boling's friend did not mean that he was not also acting as his spiritual advisor.
In Burger v. State, 238 Ga. 171, 231 S.E.2d 769 (Ga. 1977), the Supreme Court of Georgia held that the defendant's revelations to a Reverend Spurling that he intended to kill his wife and her lover were not privileged because they were not made to Spurling in his capacity as a minister. In that case, Spurling was the defendant's "friend and frequent companion," someone the defendant conversed with on a regular basis. 238 Ga. at 172,231 S.E.2d at 771. If the statements are "conversational" in that they were made to the other person as a friend regardless of that person's status as clergy, then the statements were not subject to privilege. Id. In this case, however, Pastor Henderson cannot be construed as the appellant's "frequent companion." It is apparent that Pastor Henderson's status as a pastor influenced the appellant's decision to telephone her. Furthermore, Pastor Henderson was acting in her "professional capacity of spiritual advisor in the broadest sense."
Pastor Henderson's aversion to classifying the conversations with the appellant as confidential, however, is justified. The confidentiality of the conversations is suspect, not because of the nature of Pastor Henderson's role, but rather because of the nature of the appellant's disclosure that he intended to kill his former girlfriend if she did not return to him. Pastor Henderson, believing that the appellant might carry out his threats, understandably tried to get the appellant to give her his former girlfriend's name in order to warn her. Although she failed to learn the former girlfriend's name, Pastor Henderson obviously valued protecting the woman's life over and above keeping the threats confidential.
Unfortunately for clergy placed in such difficult situations, there are no explicit guidelines on how to balance the values of confidentiality and safety to third parties. Rule 505 does not contain any specific provision addressing the confidentiality of threats of violence. However, in defining which communications are confidential, the Advisory Committee's Notes compare the clergyman privilege and the attorney-client privilege: "The definition of the term [confidential] is consistent with its use in the attorney-client privilege." Under Rule 502(d)(1), Ala. R. Evid., communications in which a client seeks the advice of an attorney for aid in the commission or furtherance of a crime are not privileged. Although Rule 505 does not contain a similar provision covering communications with clergy that indicate an intention to commit a crime, the Advisory Committee's Notes again draw a parallel with the attorney-client privilege: "Communications to the clergyman in furtherance of a crime or fraud would not qualify as seeking spiritual advice and therefore would not fall within the protection of the privilege." Therefore, even though the clergyman privilege provision of Rule 505 does not specifically list exceptions to the general rule, the Advisory Committee clearly intended that the scope of that privilege would be comparable to the scope of the attorney-client privilege. *Page 562 
Because we agree that a privilege should not be used where to do so would allow the commission of future violent crimes, we hold that threats of violence toward third parties that are revealed to clergy are not covered by the "communications to clergyman" privilege and that clergy may testify to those threats in subsequent proceedings. In the present case, the appellant's statement to Pastor Henderson that if his former girlfriend would not come back to him, he would kill her presented Pastor Henderson with concern over the safety of another. Although the appellant would not disclose to Pastor Henderson his former girlfriend's name, the appellant had no reasonable expectation that Pastor Henderson would keep such a revelation confidential. The policy of preventing violence from occurring strongly outweighs the value of confidentiality. Therefore, the trial court's admission of Pastor Henderson's testimony regarding the appellant's threats to kill his former girlfriend was not error.
Although the parts of the conversations testified to by Pastor Henderson that did not touch on the threat to kill the appellant's former girlfriend were covered by the clergyman privilege, any error in allowing this testimony was harmless. The statement that he would kill his former girlfriend was overwhelmingly the most incriminating statement the appellant made to Pastor Henderson. Therefore, any statements that did not relate to that threat would have no effect on jury deliberations.
 II.
The appellant next contends that the trial court reversibly erred by allowing into evidence a knife covered with human bloodstains found three months after Moore's murder in the closet of the house in which Moore was murdered. According to the appellant, this knife had no probative value and clearly served only to inflame the jury, thereby prejudicing his case.
In order to be admissible under Alabama law, evidence must merely have "any probative value, however slight, upon a matter in the case." C. Gamble, McElroy's Alabama Evidence, (5th ed. 1996) § 21.01(1). The record reflects that there was evidence from which the jury could infer that the knife was the murder weapon, specifically, evidence that the knife was found in the same house in which the murder occurred and that the knife was covered with human blood. Furthermore, the doctor who performed the autopsy testified that the cause of death was a stab wound to the chest.
The appellant also claims that there was no connection made between him and the knife, making that piece of evidence irrelevant to the determination of his guilt. However, there was evidence that the appellant always carried a knife on his person. Although this evidence may be considered slight and by itself would not be enough to convict the appellant, it does make the finding of the knife "of consequence" in the determining the appellant's guilt. The jury was entitled to consider what type of weapon was used in the murder and whether the appellant was likely to use such weapon. This probativeness is not outweighed by any prejudice. Therefore, the trial court's admission of the knife into evidence was not error.
 III.
The appellant next argues that his conviction must be reversed because the trial court failed to instruct the jury on heat-of-passion manslaughter as he requested. There is no written request for such an instruction, and the record is unclear as to exactly what kind of request, if any, was made. The State maintains that the appellant requested a charge for reckless manslaughter because, it says, the trial judge based his denial of the charge on Gray v. State, 482 So.2d 1318 (Ala.Cr.App. 1985), a case involving a request for a reckless manslaughter charge. However, in this case, whether a heat-of-passion or a reckless manslaughter charge was requested, no manslaughter charge was warranted.
In Gray there was evidence that the defendant, who had been convicted of murder, was insane at the time of the killing. Id.
at 1319. The defense argued that this evidence mandated a reckless manslaughter charge just as would evidence of intoxication. *Page 563 
However, this Court held in Gray, "It is no error to refuse to charge on manslaughter where the evidence clearly shows that the accused, if sane, is guilty of murder." Gray, 482 So.2d at 1319. There was no evidence that the defendant was intoxicated at the time of the murder and the expert testimony concerning his insanity was not sufficient to require a charge for either reckless or heat-of-passion manslaughter. Id. This Court specifically addressed heat-of-passion manslaughter, stating, "An extreme emotional or mental disturbance does not reduce murder to manslaughter." Id.
There was testimony in the present case that the appellant suffered from a "serious mental disorder" and an "enraged and out of control mental state" that could possibly have been factors in the murder. However, according to Gray such evidence alone does not require the trial judge to instruct on manslaughter. There was no evidence that the appellant was legally provoked to kill out of heat of passion. Turner v. State, 708 So.2d 232
(Ala.Cr.App. 1997). Alabama courts have recognized only two situations that constitute legal provocation: "(1) when the accused catches his/her spouse in the act of adultery; and (2) when the accused [is] assaulted or [is] faced with what [appears to the accused] to be an imminent assault." Id. at 234. There was no evidence in the present case of either kind of provocation. Therefore, it was not error to refuse an instruction on heat-of-passion manslaughter.
 IV.
The appellant contends that the State violated his due process rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963). by failing to timely disclose exculpatory evidence. According to the appellant, the State did not disclose to him or his attorneys evidence of "bloody hand smears" until the sentencing stage. According to the Alabama Supreme Court inEx parte Williams, 642 So.2d 391, 393 (Ala. 1993), to establish aBrady violation a defendant must show: (1) that the state suppressed the evidence; (2) that the evidence suppressed was favorable to the defendant or was exculpatory; and (3) that the evidence was material.
Although it is unclear from the record whether the State suppressed any evidence at all, the appellant has clearly failed to show that any such suppressed evidence was favorable to him or was exculpatory. The appellant asserts that the "bloody hand smears" were first made known to his trial attorneys through the presentence report. However, the presentence report has not been made part of the record. Furthermore, the State, in its memorandum in opposition to defendant's motion for a new trial, argues that what initially appeared to be bloody smears, were, after further investigation, revealed not to be bloody smears. This conclusion was alleged to be supported by Exhibit A, a serological examination. Although Exhibit A was also not made part of the record, the burden of showing that suppressed evidence is favorable to or is exculpatory is on the defendant. Therefore, the appellant has failed to establish that any Brady
violation has occurred.
The appellant contends that the trial judge reversibly erred by elaborating during his instructions to the jury about what might happen to the appellant if he were found not guilty by reason of insanity. During these instructions, the trial judge stated:
 "If you find from the evidence that the defendant has met its burden to prove this defense and you are satisfied from clear and convincing evidence that at the time of the acts which constitute all or an essential element of the offense of murder the defendant was suffering from a severe mental disease or defect which caused him to be unable to appreciate the nature and quality or wrongfulness of his acts, then your verdict would be that the defendant is not guilty by reason of mental disease or defect. Your deliberations would then end and your foreperson would mark the form of verdict which says not guilty by reason of severe mental disease or defect and would sign the form.
 "Now, during your deliberations there are a couple of things that would be improper *Page 564 
for you to consider or discuss. The first of those that is improper for you to consider is what punishment would be imposed upon the defendant in the event of a guilty verdict. It's my duty under the laws of this State and not yours to set the punishment, if any, to be imposed in the event of a guilty verdict. The second thing that would be improper for you to consider or to be concerned with is what may happen to the defendant should there be a verdict of not guilty by reason of severe mental disease or defect. The law of this State provides that again it's my duty and responsibility, not yours, to determine what is to be done with the defendant after holding a separate hearing. So do not permit yourselves to be concerned with that matter as it is not a part of your duty or responsibility in this case."
(R. 565-66.) As this Court stated in Gray, 482 So.2d at 1321, "A judge should not leave the jury with `the impression that the defendant would be left to go free and unfettered if the jury determined him not guilty by reason of insanity' Hanes v. State, 56 Ala. App. 467,469, 323 So.2d 118, 119 (1975)." The trial judge's comments in this case, which merely indicated that it was his responsibility rather than the jury's to decide what should happen to the appellant upon the return of a not-guilty-by-reasonof-insanity verdict and that a separate hearing would be held for that purpose, did not give any indication of the determination he would reach or what might happen to the appellant under such circumstances. Like those inGray, 482 So.2d at 1321, these comments did not have an "unfair and chilling impact." Therefore, the above instructions were not error.
 VI.
The appellant argues that his conviction is due to be reversed because, he says, the trial court failed to give proper consideration to its own expert for purposes of determining his competency to stand trial. In Cliff v. State, 518 So.2d 786, 790
(Ala.Cr.App. 1987), this Court discussed a defendant's rights to have a mental competency examination, a trial judge's duties regarding determining the competency of a defendant, and the standard of reviewing a trial judge's finding of competency to stand trial:
 "A defendant does not have a right to a mental examination whenever he requests one, and, absent such a right, the trial court is the screening agent of such requests. Robinson v. State, 428 So.2d 167
(Ala.Cr.App. 1982); Beauregard v. State, 372 So.2d 37 (Ala.Cr.App.), cert. denied, 372 So.2d 44 (Ala. 1979). The defendant bears the burden of persuading the court that a reasonable and bona fide doubt exists as to the defendant's mental competency, and this is a matter within the discretion of the trial court. Miles v. State, 408 So.2d 158 (Ala.Cr.App. 1981), cert. denied, 408 So.2d 163 (Ala. 1982). In determining whether an investigation into the defendant's sanity is required, the trial court must determine if any factual data establish a reasonable ground to doubt the defendant's sanity. Beauregard, 372 So.2d at 43. Where the trial court finds that the evidence presents no reasonable grounds to doubt the defendant's sanity, the standard of appellant review is whether the trial court abused its discretion. Id."
After being requested by the appellant, the trial judge ordered a mental evaluation of the appellant to be performed by Dr. Lawrence Maier. Dr. Maier found that no reasonable grounds existed to doubt the appellant's competency. He also stated in his report:
 "I cannot with strong clinical certainty rule out the likelihood that serious mental illness played some significant role in the killing of his girlfriend. . . .
 "It was also possible his enraged and out of control mental state resulted from a combination of the delusional beliefs and intoxication.
 "There seems little question but what this man has a serious mental disorder."
No further mention was made regarding the appellant's competency to stand trial until the morning of trial, at which time the appellant's trial counsel requested a competency hearing. The trial judge listened to arguments of both sides before holding that no reasonable ground existed to doubt the appellant's mental competency to stand trial. *Page 565 
The appellant raises both a procedural and a substantive issue concerning his competency. According to the appellant, he had a right pursuant to Rule 11.6(a), Ala. R. Crim. P., to a competency hearing within 42 days of the receipt of the report of his mental examination. The report was completed on August 9, 1996, yet the trial was not held until June 1997. However, Rule 11.6(a) does not automatically require a competency hearing following the mental examination. Only when the judge finds after a review of the reports that "reasonable grounds exist to doubt the defendant's mental competency" is the judge required to set a competency hearing and that hearing must be held not more than 42 days after the judge receives the report. There is no indication that the trial judge in this case ever found reasonable grounds to doubt the defendant's mental competency. Therefore, the trial judge did not deviate from the procedure outlined in Rule 11.6(a).
The appellant also claims that the trial judge's finding that the appellant was competent to stand trial was substantively wrong. In order to overturn the trial judge's competency determination, we must find that the judge abused his or her discretion. Cliff, 518 So.2d at 790. The trial judge based his competency determination upon Dr. Maier's report and upon pro se pleadings filed by the appellant. According to the appellant, Dr. Maier's statements in his report concerning the appellant's "serious mental disorder" and its possible effect on Moore's killing constitute reasonable grounds to doubt the appellant's competency. However, while these statements would be relevant in determining the appellant's insanity at the time of the offense, they are not relevant as to whether the appellant is competent to stand trial. According to Rule 11.1, Ala. R. Crim. P.:
 "A defendant is mentally incompetent to stand trial or to be sentenced for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant.'
Even if a serious mental illness causes a defendant to commit an offense, that defendant may still be competent to stand trial so long as he has sufficient understanding of the proceedings against him and an ability to aid his counsel in preparation for his defense.
There is no evidence in the record that the appellant did not understand the proceedings against him or that he was unable to aid his attorneys in preparing his defense. The appellant's trial counsel did state that the character traits referred to by Dr. Maier "make it difficult for us to communicate with [the appellant] and for him to communicate with the Court and for him to know what's going on." These bare statements by the appellant's trial counsel are not supported by any evidence, such as specific examples or explanations of difficulties in communicating.
 "In the absence of any evidence, the mere allegations by counsel that the defendant is incompetent to stand trial do not establish reasonable grounds to doubt the defendant's sanity and warrant an inquiry into his competency. Whorton v. State, 422 So.2d 812 (Ala.Cr.App. 1982)."
Cliff, 518 So.2d at 791. Therefore, there is no indication that the trial judge abused his discretion when he found that no reasonable grounds existed to doubt the appellant's competency to stand trial.
 VII.
The appellant contends that the trial judge erred in denying his motion for a judgment of acquittal because, he says, the State failed to carry its burden of proof. The appellant cites the lack of forensic evidence linking him to the scene and states, "The only evidence presented was that he had a relationship with Moore and had been seen at her home earlier in the day as had several other persons." (Appellant's brief at 19.)
The evidence at trial, viewed in the light most favorable to the State, tended to show that Moore had recently ended her relationship with the appellant, and that on the three nights before Moore was killed, the appellant telephoned Pastor Frankie Henderson, expressing to her that he was upset, that he had been watching Moore, and *Page 566 
that if Moore did not come back to him, that he would kill her. On the morning Moore was killed, the appellant was dropped off at Dora Plunkett's house, where Plunkett and Moore were cleaning house. The appellant began talking with Moore. The appellant asked Plunkett if he and Moore could go into a little blockhouse on Plunkett's property. They both walked towards the blockhouse, stopping in front. The appellant approached Plunkett and asked her if he could have five minutes with Moore in the blockhouse. After Plunkett agreed, the appellant and Moore went into the blockhouse. After about four or five minutes, the appellant came out of the blockhouse and asked Plunkett if he could have five more minutes with Moore. Plunkett responded that she did not care. The appellant reentered the blockhouse, but then came back out saying he would be done in five more minutes. Plunkett did not see the appellant again that day after this last time he asked for five extra minutes. After realizing that the appellant and Moore had spent an extended time in the blockhouse, Plunkett and her husband went into the blockhouse and found Moore lying on the couch, dead. Plunkett had not seen anyone else go into the blockhouse after the appellant had gone in with Moore and she testified that nobody could have entered without her having seen him or her. An autopsy showed that the cause of death was a stab wound to the chest. Later that same morning, the appellant showed up at the house of Regina Woods, his cousin, with "sweat . . . pouring off of him." Woods's house was about a mile from the site of the murder. Woods's husband then drove the appellant to Cullman. About three months later, Felton Suggs, who was moving into the blockhouse on Plunkett's property, found a knife covered with human blood as he was cleaning the closet in the blockhouse. Although there were no eyewitnesses or forensic evidence connecting the appellant with the crime, there was enough circumstantial evidence to support the appellant's conviction. Based upon this evidence, a jury could have reasonably found the appellant guilty beyond a reasonable doubt.
 VIII.
The appellant finally argues that the trial court erred by allowing a State's witness, Dr. Lawrence Maier, to testify about the details of the appellant's prior conviction for assault. Pursuant to Rule 404, Ala. R. Evid., prior convictions or bad acts are inadmissible merely to show a defendant's poor character or propensity to commit a crime. Dr. Maier testified that in 1991 he performed a competency evaluation for the appellant in connection with an assault case where the appellant had allegedly attacked a man with a knife. However, the only objection made by the appellant's counsel during this testimony was an objection to Dr. Maier's stating his opinion because, counsel argued, his opinion was not based upon facts in evidence and was not relevant to the appellant's current mental state. The trial court allowed Dr. Maier to testify as to whether he had reached an opinion in 1991 regarding the appellant's mental state, but instructed the prosecutor that if he wanted to go any further, he had to lay the proper foundation. At no point did the appellant's counsel move to exclude the evidence based upon its being improper evidence of a collateral offense. Therefore, this issue has not been preserved for review. See Marty v. State, 656 So.2d 416, 421
(Ala.Cr.App. 1994). The judgment of the circuit court is due to be affirmed.
AFFIRMED.
All judges concur. *Page 1137