PARKER, Justice
(dissenting).
Father Zoghby’s counseling records from his treatment at a counseling clinic in New York state were originally protected by the psychotherapist-patient privilege. However, Linda Ledet, the plaintiff, contends that Father Zoghby waived that privilege when he consented to the release of those records to Archbishop Lipscomb, because, she asserts, the Archbishop’s relationship to Father Zoghby was that of an investigator of her complaint and a supervisor, not a spiritual advisor. I respectfully disagree.
The clergy-parishioner privilege, long recognized and protected under the common law and by statute, was broadened substantially with the adoption of Rule 505(a)(2), Ala. R. Evid.:
“If any person shall communicate with a clergyman in the clergyman’s professional capacity and in a confidential manner, then that person or the clergyman shall have a privilege to refuse to *328 disclose, and to prevent another from disclosing, that confidential communication.”
As observed in Tankersley v. State, 724 So.2d 557, 560 (Ala.Crim.App.1998):
“Although § 12-21-166 [Ala.Code 1975] limited the clergyman privilege to communications that were either confessional or marital in nature, Rule 505 has explicitly broadened the scope of the privilege to include ‘all conferences where the clergyman is consulted in the professional capacity of spiritual advisor in the broadest sense.’ Ala. R. Evid. 505, Advisory Committee’s Notes.”
Asked during deposition whether he had acted as Father Zoghby’s spiritual advisor, Archbishop Lipscomb initially answered in the negative; he then, however, qualified his answer, saying that the term “spiritual advisor” is “very ambiguous” in the vocabulary of the Catholic Church. He went on to say in his deposition that he and Father Zoghby “discussed things that I thought were necessary for his healing” and that in his role as archbishop he had a duty to protect the victims of sexual misconduct by priests, and “[t]hen you try to deal with the perpetrator to see is he salvageable and what are the conditions under which you might approach a return to some kind of active ministry.” He testified that he selected a program of counseling that involved Father Zoghby’s living in a New York monastery and undergoing treatment at a nearby hospital, because he had hoped this treatment could rehabilitate Father Zoghby.
Father Zoghby says in his affidavit that Archbishop Lipscomb has served as his bishop and spiritual advisor, that he has entrusted many confidential matters to Archbishop Lipscomb over the years, and that he has had many private discussions with Archbishop Lipscomb concerning his spiritual growth and discernment.
All of this leads me to conclude that Archbishop Lipscomb was acting “in the clergyman’s professional capacity” as Rule 505(b) requires for the clergyman privilege to apply and that he was a “spiritual advis- or” to Father Zoghby “in the broadest sense” as explained in the Advisory Committee’s Notes to Rule 505. Because of the rehabilitative purpose and nature of Church discipline, I do not believe Archbishop Lipscomb’s roles here as investigator, supervisor, and spiritual advisor can be as neatly compartmentalized as the majority opinion implies.
Rule 505(b) limits the clergyman privilege to situations in which the person who made the communication has “communicate[d] with a clergyman in the clergyman’s professional capacity and in a confidential manner.” In any determination of whether Father Zoghby communicated with Archbishop Lipscomb “in a confidential manner,” Father Zoghby’s perception is critically important.
Because no clergy-parishioner case is directly on point, I shall cite analogous cases involving the parallel attorney-client privilege. In Tankersley, it was noted that the Advisory Committee’s Notes to Rule 505(b) draw a comparison between the two privileges:
“[I]n defining which communications are confidential, the Advisory Committee’s Notes compare the clergyman privilege and the attorney-client privilege: ‘The definition of the term [confidential] is consistent with its use in the attorney-client privilege.’ Under Rule 502(d)(1), Ala. R. Evid., communications in which a client seeks the advice of an attorney for aid in the commission or furtherance of a crime are not privileged. Although Rule 505 does not contain a similar privilege covering communications with clergy that indicate an intention to commit a *329 crime, the Advisory Committee’s Notes again draw a parallel with the attorney-client privilege: ‘Communications to the clergyman in furtherance of a crime or fraud would not qualify as seeking spiritual advice and therefore would not fall within the protection of the privilege.’ Therefore, even though the clergyman privilege of Rule 505 does not specifically list exceptions to the general rule, the Advisory Committee clearly intended that the scope of that privilege would be comparable to the scope of the attorney-client privilege.”
724 So.2d at 561.
As the United States Court of Appeals for the Seventh Circuit observed in Westinghouse Electric Corp. v. Kerr-McGee Corp., 580 F.2d 1311, 1319 n. 14 (7th Cir.1978)(quoting R. Wise, Legal Ethics 284 (1970)): “ ‘The deciding factor is what the prospective client thought when he made the disclosure, not what the lawyer thought.’ ” Westinghouse also quoted McCormick on Evidence § 88, p. 179 (2d ed.1972), as saying that the attorney-client privilege “‘hinges upon the client’s belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice.’ ” 580 F.2d at 1319.
Other courts have held that “[i]n determining whether an attorney-client relationship has been created, the focus is on the putative client’s subjective belief that he is consulting a lawyer in his professional capacity, and on his intent to seek professional advice.” Dalrymple v. National Bank & Trust Co., 615 F.Supp. 979, 982 (W.D.Mich.1985). In United States v. Dennis, 843 F.2d 652, 657 (2d Cir.1988), the United States Court of Appeals for the Second Circuit said that the key is the “intent of the client” and whether he or she “reasonably understood” that the disclosure was to be confidential. Kevlik v. Goldstein, 724 F.2d 844, 849 (1st Cir.1984), held: “The guiding principle ... is the intent of the client.” Callas v. Pappas, 907 F.Supp. 1257, 1262 (E.D.Wis.1995), held that the attorney-client relationship arose when the putative client “reasonably believed” he was consulting with an attorney in the attorney’s professional capacity. Herbes v. Graham, 180 Ill.App.3d 692, 699, 536 N.E.2d 164, 168, 129 Ill.Dec. 480, 484 (1989), held that cases involving the attorney-client privilege “focus on the client’s viewpoint rather than that of the attorney.” And in In re Anonymous, 655 N.E.2d 67, 70 (Ind.1995), the Supreme Court of Indiana held that an “important factor is the putative client’s subjective belief that he is consulting a lawyer in his professional capacity .... ”
In his affidavit, Father Zoghby clearly and unequivocally stated that he signed an authorization releasing his treatment records to Archbishop Lipscomb and to no other person, that he agreed to release the records to Archbishop Lipscomb in Archbishop Lipscomb’s capacity as his bishop and his spiritual advisor, and that it was his clear understanding that the records were protected by the psychotherapist-patient privilege before the release and by the clergy-parishioner privilege after the release. These statements of Father Zoghby are unrefuted.
Because Archbishop Lipscomb acted in a “clergyman’s professional capacity” and as Father Zoghby’s “spiritual advisor in the broadest sense” and because Father Zoghby clearly and reasonably believed when he authorized the release of his records that these records were within the protection of the clergy-parishioner privilege, I believe the records are privileged under Rule 505(b). I further believe that, just as the attorney-client privilege is a deeply rooted common-law principle deemed essential to ensure the client’s *330 right to effective representation of counsel, so also is the clergy-parishioner privilege a deeply rooted common-law principle deemed essential to protect the right of penitents to seek spiritual help and to preserve the integrity of the Church.
I therefore dissent.