Rudolph Edward KOS, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 05–98–00603–CR to 05–98–00609–CR.

Court of Appeals of Texas, Dallas.

April 6, 2000.

Douglas H. Parks, Law Offices of Douglas H. Parks, Dallas, for Appellant.

Lisa L. Braxton Smith, Asst. Dist. Atty., Dallas, for State.

Before Justices WHITTINGTON, WRIGHT, and BRIDGES.

## OPINION

Opinion By Justice BRIDGES.

Rudolph Edward Kos appeals three convictions for aggravated sexual assault of a child under fourteen, three convictions for indecency with a child, and one conviction for sexual assault of a child. In six points of error, appellant contends the trial court erred in (1) admitting certain evidence at trial, and (2) denying him the right to testify during punishment without waiving his Fifth Amendment right not to testify regarding certain "uncharged extraneous conduct." For the reasons set forth below, we affirm the trial court's judgments.

### BACKGROUND

From 1981 to 1992, appellant served as a Catholic priest in a number of parishes in the Dallas area. In October 1997, the grand jury indicted appellant on three counts of aggravated sexual assault, three counts of indecency, and one count of sex-

ual assault.[1] Appellant pleaded guilty to the sexual assault charge (cause number 05–98–00606–CR) and two of the indecency charges (cause numbers 05–98–00608–CR and 05–98–00609–CR). The remaining cases were tried to a jury. During trial, the jury heard from fifteen witnesses. After considering their testimony, the jury convicted appellant in all four cases. Following the verdicts, the jury heard evidence on punishment. During the punishment hearing, appellant indicated a desire to testify on his own behalf, but only if he could do so without waiving his right not to testify regarding certain "uncharged extraneous conduct." When the trial court refused appellant's request, appellant declined to testify. Thereafter, the jury assessed punishment at life imprisonment and a $10,000 fine in each of the aggravated sexual assault cases and twenty years' confinement and a $10,000 fine in each of the remaining cases. These appeals followed.

## PHYSICIAN–PATIENT PRIVILEGE

■ In his first point of error, appellant contends the trial court erred in admitting evidence from Dr. Jay Feierman, a physician who treated appellant in New Mexico. According to appellant, admitting evidence of his statements to Dr. Feierman was improper because it violated the physician-patient privilege afforded him under New Mexico law. After reviewing the record in these causes as well as applicable law, we cannot agree with appellant.

Rule 509(b) of the Texas Rules of Evidence clearly states that, in Texas, no physician-patient privilege exists in criminal proceedings. Tex.R. Evid. 509(b). Nevertheless, appellant argues the trial court should have excluded his statements to Dr. Feierman because (1) New Mexico law recognizes a privilege between doctor and patient, and (2) appellant made his statements to Dr. Feierman while in New Mexi-

co. Although the State concedes that, in New Mexico, a privilege exists for statements made to a physician, it nevertheless contends admission of the statements was proper because (1) Texas does not recognize any such privilege, and (2) Texas law controls the admissibility question in these cases. We agree with the State.

■ Section 139(2) of the Restatement (Second) of the Conflict of Laws states:

Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum *will be admitted* unless there is some special reason why the forum policy favoring admission should not be given effect.

Restatement (Second) of Conflict of Laws § 139(2) (1988) (emphasis added). Section 139(2) recognizes the "strong policy" a forum state has in disclosing "all relevant facts that are not privileged under its own local law." *Id.* cmt. d. Thus, under section 139(2), a forum state *will* admit evidence that is not privileged under local law, unless it finds the local policy favoring admission is outweighed by countervailing considerations. *Id.*

■ Comment d to section 139 sets out certain factors a court should consider in determining whether to admit evidence that, while privileged in the "most significant relationship" state, is not privileged in the forum state. Those factors include:

(1) the number and nature of the contacts the forum state has with the parties and the transaction involved;

(2) the relative materiality of the evidence sought to be excluded;

(3) the kind of privilege involved; and

(4) fairness to the parties.

*Id.* The forum state should, according to the Restatement, be more reluctant to give effect to a foreign privilege if the contacts

---

1. Appellant was also charged with a fourth count of indecency; however, the jury acquitted him of that charge.

with the forum state are "numerous and important." *Id.* On the other hand, the forum state should be more inclined to give effect to a foreign privilege if the facts established by the subject evidence would be unlikely to affect the outcome of the case or could be proved in some other way. *Id.* Likewise, the forum state should be more inclined to give effect to a foreign privilege if it (1) is well established and recognized in many states, (2) is generally similar to one or more privileges found in local law, and (3) was relied upon by the parties when making the communication. *Id.*

■ Under rule 104(a) of the Texas Rules of Evidence, preliminary questions of admissibility, including questions concerning the existence of a privilege, are for the trial court. *See* TEX.R. EVID. 104(a); *see also McVickers v. State*, 874 S.W.2d 662, 664 (Tex.Crim.App.1993). When making a privilege determination, the trial court is afforded broad discretion. *See Welch v. State*, 908 S.W.2d 258, 264 (Tex. App.-El Paso 1995, no pet.). We review the trial court's decision under an abuse of discretion standard. *See Carmona v. State*, 947 S.W.2d 661, 664 (Tex.App.-Austin 1997, no pet.). Under that standard, we reverse a trial court's determination only when "the trial court applied an erroneous legal standard, or when no reasonable view of the record could support the trial court's conclusion under the correct law and the facts viewed in the light most favorable to its legal conclusion." *See id.; see also Welch*, 908 S.W.2d at 264.

In this case, there is no dispute that New Mexico is the state with the most significant relationship to the communications at issue. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 139 cmt. e (1988) (noting that state with most significant relationship will usually be state where

communication took place). In addition, there is no dispute that New Mexico law recognizes a physician-patient privilege in the context of criminal proceedings and Texas law does not. Thus, the only question we must decide is whether, under section 139(2), any "special reason" exists for giving effect to New Mexico's physician-patient privilege. After reviewing the record in these causes, we conclude there is not.

■ We begin our analysis by reference to the four factors set out in comment d of the Restatement.[2] Under comment d, the first factor we consider is the number and nature of the contacts between the forum state (*i.e.,* Texas) and the parties and the transaction involved. A review of the record makes clear that those contacts are both numerous and significant. According to the record, appellant was a Catholic priest who resided in and ministered to the people of this State for more than ten years. During that time, appellant allegedly molested a number of children. All of the offenses occurred in Texas, and all of the child victims are residents of Texas. Under these circumstances, we conclude (1) the "number and nature" of the Texas contacts are significant, and (2) this factor weighs in favor of applying Texas law to the privilege issue. *See id.* cmt. d (noting that forum will be more reluctant to apply foreign privilege when contacts with forum are "numerous and important").

We likewise conclude the second factor, materiality of the evidence, weighs in favor of admission. The statements made to Dr. Feierman involved the molestation of several children from a number of Catholic parishes. In those statements, appellant *admitted* molesting several children. These statements, when considered in light

---

**2.** We note, in applying the Restatement, that (1) both sides have cited section 139 of the Restatement as authority in support of their respective positions, and (2) the highest civil court in this State has in the past relied on that section to determine the applicability of

another state's privilege. *See Ford Motor Co. v. Leggat*, 904 S.W.2d 643, 646–48 (Tex.1995) (orig.proceeding). Under these circumstances, we conclude section 139 applies to the "conflict of law" question presented here.

of the charges against appellant, are clearly material because they could potentially affect the outcome of these cases. Under these circumstances, we conclude the "materiality" factor weighs in favor of admitting Dr. Feierman's testimony. *See id.* (noting that forum will be more inclined to give effect to foreign privilege if facts established by evidence would be *unlikely* to affect outcome).

We reach a similar conclusion with respect to the third factor—the kind of privilege involved. With respect to this factor, we note that, even if it were true (as appellant suggests) that the physician-patient privilege has been "adopted, in some form, by every state," the privilege has *not* been adopted for criminal cases in this State and, in fact, its use in criminal proceedings has been explicitly *rejected* in this State. *See* Tex.R. Evid. 509(b). Thus, we are not dealing with a situation where the forum law is merely *silent* on the use of a particular privilege; rather, we are faced with a situation where the forum law has specifically disavowed the existence of the privilege. Under these circumstances, we conclude the third factor weighs against applying the New Mexico privilege.

The fourth factor is fairness to the parties. Under this factor, we consider the extent to which a party relied upon the privilege when making the communication in question. *See* Restatement (Second) of Conflict of Laws § 139 cmt. d (1988) (noting that forum will be more inclined to give effect to foreign privilege if it was "probably" relied on by parties). In these cases, there is some indication that appellant made the subject statements to Dr. Feierman with the understanding that they would remain confidential. However, from the record, it is not clear whether appellant, when making the statements, was actually *relying* on the existence of some type of privilege (or on the fact that

communications of this nature are generally treated in strict confidence) or whether he was simply *intending* that the communications remain confidential. *See id.* (stating specifically that reliance may be found when parties actually rely on privilege or when parties rely on fact that type of communication involved is treated in strict confidence by foreign state). Under these circumstances, we cannot conclude the fairness factor weighs in favor of applying New Mexico law.[3]

For the reasons stated, we conclude the trial court did not abuse its discretion in determining that no "special reason" existed why this State's policy favoring admission of the subject statements should not be given effect. *See* Restatement (Second) of Conflict of Laws § 139(2) (1988). Accordingly, we conclude the trial court did not err in admitting the subject statements at trial. We overrule appellant's first point of error.

## CLERGY–COMMUNICANT PRIVILEGE

 In his second point of error, appellant contends the trial court erred in admitting certain testimony from Father Killian Broderick, a Catholic priest who spoke to appellant after some of the allegations in these cases were reported. According to appellant, admitting Father Broderick's testimony was improper because appellant's statements to Father Broderick were privileged under Texas Rule of Evidence 505. Again, after reviewing the record in these causes as well as applicable law, we cannot agree with appellant.

 Rule 505(b) affords a privilege for confidential communications made by a person to a member of the clergy "in the member's professional character as [a] spiritual advisor." Tex.R. Evid. 505(b). Under rule 505, a communication is "confi-

---

**3.** Even if we were to conclude, however, that this factor weighed in favor of applying New Mexico law, this would not necessarily change our result. Appellant has cited no authority, and we have found none, indicating that a finding of reliance by the statement's declarant *automatically* requires application of the foreign privilege.

dential" if it is "made privately and [is] not intended for further disclosure except to other persons present in furtherance of the purpose of the communication." TEX.R. EVID. 505(a). Although the privilege afforded by rule 505 is broader than that recognized in some jurisdictions, *see Easley v. State,* 837 S.W.2d 854, 856 (Tex. App.-Austin 1992, no pet.) (per curiam) (noting that rule is broader because communication need not be penitential to qualify for protection), the protection afforded by the rule is not unlimited.[4] Under the express language of the rule, the privilege only extends to communications addressed to a clergyman *in his professional capacity as a spiritual advisor,* not to every private communication made to a clergy member. *See id.*

In these cases, the trial court held a pretrial hearing to determine the applicability of the clergy-communicant privilege. During the hearing, Father Broderick testified that, at the time appellant made the subject statements, Father Broderick was a Catholic priest as well as the director of the "Catholic Charities of the Diocese." According to Father Broderick's testimony, appellant made the subject statements to him during a September 1992 meeting Father Broderick called to discuss the allegations of sexual abuse. The meeting, according to the record, was not held at appellant's request, but at the request of Father Broderick, who had recently been notified about the charges. Father Broderick testified that, at the time, he was "part of a committee that at one time ... had intervened when there was an allegation of child abuse." According to his testimony, he presumed, when he called the meeting with appellant, that he was "just continuing in that responsibility as the committee of disciplinary intervention." He testified the purpose of the meeting was to confront appellant about the abuse allegations.

During the meeting, Father Broderick questioned appellant about the allegations of sexual abuse, and appellant acknowledged at that time that the allegations were, for the most part, true. Although Father Broderick testified appellant appeared remorseful during the meeting, he also testified his conversations with appellant were not part of a "Catholic confession" in which he was giving, and appellant was seeking, spiritual advice. He likewise testified that (1) there was no discussion of "sin" during the meeting, and (2) appellant did not seek any advice at that time on how he could reconcile himself with the church. Finally, Father Broderick testified that, at the time of the meeting, he was not concerned about the "state of [appellant's] soul"; rather, he described the meeting as a "disciplinary intervention."[5]

4. Although we cite *Easley* for the proposition that rule 505 provides broader protections than do the rules in some jurisdictions, we nevertheless disagree with *Easley* to the extent it can be read to say that a communication is protected so long as it is made to a clergyman in his *professional* capacity. *See Easley,* 837 S.W.2d at 856 (stating that privilege extends to communications addressed to clergyman "in his professional capacity"). In our view, the rule requires more than just that the clergyman be acting in his professional capacity; it also requires that the clergyman be acting as a spiritual advisor. The rule itself sets out this requirement. *See* TEX.R. EVID. 505. Moreover, this distinction is critical since, without this additional requirement, the privilege could be extended to situations, like the one here, where the communications were made to the clergyman in his professional capacity as an administrator for the church, but not in his capacity as a spiritual advisor. Although we distinguish *Easley* on these grounds, we note in doing so that *Easley* itself states, in reaching its decision, that nothing in the subject communications could be characterized as "a request for spiritual guidance of consolation." *See Easley,* 837 S.W.2d at 856. Thus, it appears *Easley* itself recognizes the additional requirement set out in the rule. To the extent, however, that it does not, we expressly decline to follow it.

5. When cross-examined by defense counsel about what, if anything, came up at the meeting, Father Broderick testified:

What came up was he had no money and I gave him a thousand dollars from Catholic Charities. What came up, [was] what was he going to do with his car? What came up was what am I going to tell the people?

■ Father Broderick's testimony indicates the statements appellant made during the September 1992 meeting were not made in an effort to obtain some sort of spiritual advice or guidance; to the contrary, the meeting was more in the nature of a disciplinary/administrative meeting, with Father Broderick attempting to determine what to do in the face of the abuse allegations. We note, in this regard, that the communications between appellant and Father Broderick were not initiated by appellant; rather, they were initiated by Father Broderick for the specific purpose of obtaining information about the abuse allegations. Although it is true that rule 505 does not require for its application that the communicant be the one seeking, summoning, or soliciting the presence of the clergy, *see Nicholson v. Wittig*, 832 S.W.2d 681, 687 (Tex.App.-Houston [1st Dist.] 1992, orig. proceeding), it nevertheless does require that the communications be made for the purpose of obtaining spiritual guidance or consolation. Because there was evidence presented to the trial court indicating that the communications at issue were not motivated by any religious or spiritual considerations, we conclude the trial court could properly have found that appellant's statements were not addressed to Father Broderick in his "professional character as a spiritual advisor." *See* Tex.R. Evid. 505(b). Under these circumstances, we conclude the trial court did not abuse its discretion in (1) concluding the subject statements were not privileged under rule 505, and (2) admitting the evidence at trial. We overrule appellant's second point of error.

## EXPERT TESTIMONY

■ In his third, fourth, and fifth points of error, appellant contends the trial court erred in admitting the testimony of FBI Agent Kenneth Lanning during the punishment phase of trial. According to appellant, admitting Lanning's testimony was improper because (1) it was not relevant to any fact in issue before the jury, and (2) its probative value was substantially outweighed by the danger of unfair prejudice. After reviewing the record in these causes, we cannot agree with appellant.

At punishment, the State called Agent Lanning to testify.[6] During his testimony, Lanning explained there were two different types of sexual offenders—"preferential offenders" and "situational offenders." Lanning described "preferential offenders" as those who offend because of a particular "preference" they have (*i.e.,* for minors), not simply because an opportunity to offend presents itself. "Situational offenders," on the other hand, "take advantage of opportunities and situations" and, many times, molest because the victims are "weak, available, [and] not intimidating." Lanning then explained that various subcategories exist within the "preferential offender" category and one of those subcategories, the "seduction type" preferential offender, obtains control over his victims

Because we gave him the option of telling the people directly. And he didn't want to do it. So we talked it over, making a statement to the effect of he's resigning the parish because he's emotionally exhausted. Which at that moment was certainly true.

6. Prior to Lanning's testimony, the trial court held a hearing outside the jury's presence to determine the admissibility of his testimony. During that hearing, Lanning indicated he would testify about "how certain types of child molestors operate" and "[h]ow they obtain the victims, manipulate the victims, seduce the victims, [and] control their victims." Although Lanning testified he had not interviewed any of the victims in these cases, he indicated he had been "studying the criminal aspects of deviate sexual behavior for about [twenty-five] years" and that the last eighteen years had been spent studying the "sexual victimization of children at the Behavioral Science Unit at the FBI academy." The defense objected to Lanning's testimony, arguing (among other things) that (1) it was not relevant to any fact in issue at punishment; and (2) its probative value, if any, was substantially outweighed by the danger of undue prejudice. The trial court overruled appellant's objections, and Lanning was allowed to testify before the jury.

by seducing them with attention, affection, kindness, gifts, and money. Lanning testified that, in his experience, this type of preferential offender is generally "the most persistent and prolific with the largest number of victims." Lanning then testified, in response to a hypothetical question from the prosecutor, that a person would be "consistent" with the "seduction type" preferential offender profile if the person (1) was unmarried; (2) had many boys visiting his home everyday; (3) provided those boys with games, snacks, and alcoholic beverages; (4) took the boys on trips; and (5) engaged in massaging and other physical contact with the boys. Evidence at trial showed appellant met all of these criteria.

On appeal, appellant argues the trial court erred in admitting Lanning's testimony because (1) it was not relevant to any fact in issue during punishment, and (2) its probative value was substantially outweighed by the danger of unfair prejudice. We disagree. Under rule 401 of the Texas Rules of Evidence, evidence is relevant if it has any tendency to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. Rule 702 deals more specifically with expert witnesses. It states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX.R. EVID. 702.[7]

██ In these cases, the jury was required to determine the appropriate sentence for each of appellant's offenses. In making that determination, the jury was entitled to consider "any matter the court

deem[ed] relevant to sentencing." TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (Vernon Supp.2000) (noting that, during punishment, State and defendant may introduce any evidence court deems relevant to sentencing). One such matter is the accused's "personal responsibility" and "moral culpability" for the crime charged. *See Stavinoha v. State*, 808 S.W.2d 76, 79 (Tex.Crim.App.1991) (per curiam) (holding evidence admissible in punishment phase of trial because evidence had bearing on appellant's personal responsibility and moral guilt); *Miller–El v. State*, 782 S.W.2d 892, 896 (Tex.Crim.App.1990) (noting victim's injuries were relevant to punishment determination so long as fact finder could rationally attribute moral culpability to accused for injuries).

██ In these cases, we conclude Lanning's testimony bore on appellant's personal responsibility as well as his moral culpability for the crimes charged and, accordingly, Lanning's testimony was properly admitted during punishment. Lanning's testimony suggests that appellant's conduct toward his victims was not the result of impulsive, spur-of-the-moment decisions or momentary lapses in judgment; instead, it shows appellant's actions were part of a larger, more calculated plan that was carried out over a lengthy period of time. This evidence, in our view, could properly have been considered by the jury in determining appellant's moral culpability and personal responsibility for the crimes charged and, ultimately, the appropriate punishment to assess in each case. In addition, the testimony was useful in trying to understand the full significance of other evidence presented by the State at trial. *See* TEX.R. EVID. 702 (making expert testimony admissible if it aids fact finder in understanding evidence). Under these circumstances, we conclude the trial court did not abuse its discretion in concluding

---

7. We note that, on appeal, appellant has not challenged Lanning's qualifications as an expert.

Lanning's testimony was "relevant to sentencing" and, thus, was admissible during punishment. *See Mock v. State,* 848 S.W.2d 215, 225 (Tex.App.-El Paso 1992, pet. ref'd) (noting that trial court has "wide latitude" in determining whether evidence is deemed "relevant to sentencing"). We likewise conclude that appellant has not shown that the probative value of Lanning's testimony was substantially outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403.

In reaching our decision, we necessarily reject appellant's reliance on the El Paso Court of Appeals's opinion in *Dunnington v. State,* 740 S.W.2d 899 (Tex.App.-El Paso 1987, pet. ref'd). In that case, the court reversed a defendant's conviction, concluding that expert testimony given by a "caseworker" during the guilt/innocence phase of trial had been improperly admitted. *Id.* at 902. According to the El Paso court, the caseworker's testimony regarding "belated outcry" and the "conditioning process" to which offenders subject their child victims were not issues "so foreign to the lay juror's experience that the lack of expert interpretation would deprive the evidence of full significance." *Id.*

We have reviewed the court's opinion in *Dunnington* and, after doing so, we conclude its reasoning is not applicable here. In that regard, we note that, unlike the evidence presented in these cases, the evidence presented in *Dunnington* was admitted during guilt/innocence, not punishment. Moreover, unlike the evidence presented in *Dunnington,* the expert testimony in these cases *was* helpful for the jury in understanding the full significance of other testimony presented at trial (in particular, testimony regarding appellant's otherwise ordinary actions with the boys—*i.e.,* having them over to watch videos and play games, taking them on trips and to restaurants). Because we conclude the circumstances in *Dunnington* are distinguishable from those presented here, we conclude that decision is not controlling.

We reach a similar conclusion with respect to the decision in *Rachal v. State,* 917 S.W.2d 799 (Tex.Crim.App.1996). In that case, the court of criminal appeals upheld the exclusion of expert testimony regarding the ability of juries to accurately predict a defendant's future dangerousness. *Id.* at 817. Unlike the evidence in these cases, the evidence in *Rachal* addressed an issue that was not properly before the jury; *i.e.,* the propriety of having a special issue on future dangerousness. Because the evidence in these cases addressed an issue properly before the jury at punishment (*i.e.,* appellant's personal responsibility and moral culpability for the crimes committed), we conclude the decision in *Rachal* is not applicable.

For the reasons stated, we conclude the trial court did not abuse its discretion in admitting Lanning's testimony during the punishment phase of trial. Accordingly, we overrule appellant's third, fourth, and fifth points of error.

### FIFTH AMENDMENT

■ In his sixth point of error, appellant contends the trial court erred in denying him the right to testify during the punishment phase of trial without waiving his Fifth Amendment right not to testify regarding certain "uncharged extraneous conduct." According to appellant, refusing to limit the State's cross-examination violated his Fifth Amendment right not to incriminate himself on certain extraneous offenses.

■ The general rule is that a defendant who exercises his right to testify is subject to the same rules governing examination and cross-examination as any other witness, whether he testifies at guilt/innocence or at punishment. *See Cantu v. State,* 738 S.W.2d 249, 255 (Tex.Crim.App. 1987). Thus, he may be "contradicted, impeached, discredited, attacked, sustained, bolstered, [and] made to give evidence against himself," except where there are overriding constitutional or statutory

prohibitions. *See id.; Brown v. State*, 617 S.W.2d 234, 236 (Tex.Crim.App.1981). In the instant cases, appellant contends there are "overriding constitutional prohibitions" that justify an exception to the general rule—*i.e.*, that he had a "right not to be compelled to be a witness against himself in alleged, uncharged[ ] felony offenses, not the subject of the instant convictions." After reviewing the record in these causes as well as the authority cited by appellant, we cannot agree.

In support of his position, appellant relies on the United States Supreme Court's opinion in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and the Texas Court of Criminal Appeals's opinion in *Franklin v. State*, 606 S.W.2d 818 (Tex. Crim.App.1979) (op. on reh'g). We have reviewed those decisions and, after doing so, we conclude neither is dispositive. In *Doyle*, the Supreme Court concluded the State could not cross-examine a testifying defendant about his post-arrest silence. *See Doyle*, 426 U.S. at 611, 96 S.Ct. 2240. In *Franklin*, our court of criminal appeals reached a similar conclusion, holding that the State could not cross-examine a testifying defendant about his failure to previously raise a self-defense claim during testimony at a pretrial hearing. *See Franklin*, 606 S.W.2d at 849–50. In both cases, the courts prohibited the State from questioning the defendant about a *previous* invocation of the right to remain silent—a right the defendant had justifiably relied on at the time he made the decision to remain silent—because to do so would not only be "fundamentally unfair," but would effectively render meaningless the protections previously afforded the defendant under the Fifth Amendment. *See Doyle*, 426 U.S. at 618, 96 S.Ct. 2240; *Franklin*, 606 S.W.2d at 849.

No such concerns are presented here. In these cases, unlike in *Doyle* and *Franklin*, there was no previous invocation of the Fifth Amendment right to remain silent and, thus, no previous reliance on the protections afforded by that consti-tutional provision. Under these circumstances, we cannot conclude there is anything inherently unfair or improper about allowing the State to fully cross-examine appellant. *See Doyle*, 426 U.S. at 618, 96 S.Ct. 2240 (noting that cross-examination of defendant on post-arrest silence would be "fundamentally unfair" because, although *Miranda* warnings contained no express assurance that silence would carry no penalty, such assurance is "implicit to any person who receives warnings"); *Franklin*, 606 S.W.2d at 849.

Likewise, we conclude that allowing the State to cross-examine appellant about "uncharged extraneous conduct" (that could potentially lead to further prosecutions) does not implicate any "overriding constitutional prohibition" that would justify an exception to the general rule, as set out in *Cantu* and *Brown*. In these cases, the "constitutional prohibition" appellant seeks to invoke—the Fifth Amendment right not to testify—is the very right he would be *waiving* by seeking to testify on his own behalf. Appellant has cited no authority, and we have found none, for the proposition that a defendant in this State may take the stand, waive his Fifth Amendment rights, testify in his own defense, and at the same time limit the State's right to cross-examine him regarding any "uncharged extraneous conduct" on the basis that such questioning would infringe *on the very same Fifth Amendment rights the defendant has just chosen to waive*. Because we find no authority recognizing any such "limited" waiver, we conclude the trial court did not err in refusing appellant's request to limit the State's cross-examination. *See Brumfield v. State*, 445 S.W.2d 732, 740 (Tex.Crim. App.1969) (op. on reh'g) (noting that defendant who testifies at punishment takes stand "for all purposes").

In reaching this decision, we recognize, as the court did in *Cantu*, that when a defendant is considering whether to testify in his own defense, he has a difficult choice to make—he must decide whether to waive

his right against self-incrimination, knowing some unfavorable (and potentially indictable) evidence may be revealed, or retain his right to remain silent and, in so doing, forgo the opportunity to "tell his side of the story." *See Cantu,* 738 S.W.2d at 256. However, the court of criminal appeals has recognized that this decision, while difficult, does not impose an impermissible burden upon the exercise of a person's Fifth Amendment rights. *See id.* Nor does it violate a defendant's due process rights. *See id.* Under these circumstances, we conclude (1) the trial court's refusal to allow appellant to testify without waiving his Fifth Amendment right not to testify regarding "uncharged extraneous conduct" did not infringe on any "overriding constitutional or statutory prohibitions"; and (2) the trial court, therefore, did not err in refusing appellant's request to limit the State's cross-examination. We overrule appellant's sixth point of error.

We affirm the trial court's judgments.