# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00438-CR

**Larry Beltran, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. D-1-DC-08-500396, HONORABLE FRED A. MOORE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Larry Beltran of aggravated sexual assault of A.B., his minor daughter.[1] *See* Tex. Penal Code Ann. § 22.021 (West Supp. 2012). Beltran opted to have the trial court assess punishment and pled true to three alleged prior convictions, and the trial court sentenced him to life imprisonment. Beltran filed a motion for new trial, which was overruled as a matter of law without a hearing. *See* Tex. R. App. P. 21.8(a), (c). On appeal, Beltran contends that his trial counsel was ineffective and that the trial court erred by allowing one of the State's expert's testimony.[2] We affirm the trial court's judgment of conviction.

---

[1] Beltran was charged with one count of aggravated sexual assault of a child by penetration, one count of aggravated sexual assault by causing his sexual organ to contact the victim's sexual organ, and one count of indecency with a child by contact. *See* Tex. Penal Code Ann. § 21.11 (West 2011), § 22.021 (West Supp. 2012). The charge instructed the jury that it could only convict Beltran of one of the three charges, and the jury found him guilty of count I, aggravated sexual assault by penetration.

[2] Beltran's motion for new trial asserted only that the testimony by one of the State's expert witnesses was improper; it did not allege ineffective assistance of counsel.

**Ineffective Assistance of Counsel**

On appeal, Beltran contends that he received ineffective assistance of counsel in three respects: trial counsel (1) did not object to the State's introduction of evidence of Beltran's prior crimes, wrongs, or acts; (2) actively elicited testimony that Beltran was a registered sex offender, enabling the prosecutor to question the witness about Beltran's criminal history; and (3) called Beltran to testify when any potential advantage was substantially outweighed by the potential disadvantages of exposing Beltran to cross-examination regarding his prior convictions.

*Standard of Review*

To show ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness *and* that the deficient performance prejudiced the defendant's case. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); *Blevins v. State*, 18 S.W.3d 266, 271 (Tex. App.—Austin 2000, no pet.). To demonstrate prejudice, a defendant must show that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). The defendant must (1) overcome a strong presumption that counsel's performance fell within the range of reasonable professional assistance and (2) bring forth a record showing that counsel's performance was not based on sound trial strategy. *Thompson*, 9 S.W.3d at 813; *Blevins*, 18 S.W.3d at 271. Unless the record demonstrates that counsel's conduct was not the product of a strategic or tactical decision, we should presume that his performance was constitutionally adequate unless the challenged conduct was so outrageous that no competent attorney would have engaged in such conduct. *State v. Morales*, 253 S.W.3d 686, 696-97 (Tex. Crim. App. 2008). The record on

direct appeal is usually insufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making to overcome the presumption that counsel's conduct was reasonable and professional. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

*Factual Background*

A.B. is the child of Beltran and T.W., Beltran's ex-wife. A.B. was born in 2000 and was nine years old at the time of trial. In 2006, Beltran's father pled guilty to the aggravated sexual assault of A.B. April Abell, T.W.'s adoptive mother and A.B.'s grandmother, testified that T.W. suffered from bipolar disorder and that A.B. had come to live with Abell and her husband in January 2008 because T.W. was unable to care for her properly. Abell testified that soon after A.B. started living with them, she and A.B.'s grandfather noticed she was defecating in her underwear, despite being eight years old, and was having severe nightmares that "always revolved around her father beating her with a belt." Three or four weeks after A.B. came to live with Abell in 2008, she made an outcry that Beltran had sexually abused her about six months earlier.

A.B. testified that Beltran had touched her "private" with "[h]is private" once and that it hurt. A.B. did not tell her mother because T.W. "would get scared"; she decided to tell her grandparents about the abuse because she "knew they wouldn't get really, really scared." She also said Beltran treated her "bad" and spanked her with a belt more than once.

T.W. testified, and when the State asked her about A.B.'s 2006 outcry against Beltran's father, T.W. said she initially thought A.B. meant that Beltran had abused her, not his father. On cross-examination, trial counsel asked T.W. why she first thought Beltran, not his father, had abused A.B. in 2006. A short discussion was held at the bench, and Beltran's trial counsel said,

3

"[O]ur strategy at this point we are going to testify—we are going to go in to all this."[3] Trial counsel said he thought the State's attorney was trying to instruct T.W. not to talk about Beltran's past record, but "that's all off," explaining to T.W. that she could "answer this question fully without any restrictions whatsoever," and asking whether her assumption was due to something A.B. had said or "based on [Beltran's] record." T.W. responded that it was based on Beltran's criminal record as a sex offender. She also said Beltran had initially lied to her about his prior offense, telling her the victim was seventeen, not twelve, as she later discovered. On redirect, the State asked T.W. about Beltran's prior convictions, and she said he had gone "to jail quite often" for failure to register as a sex offender and for driving while intoxicated.

Beltran testified on his own behalf, and during his direct testimony and the State's cross-examination, he was asked about his prior convictions for indecency with a child, failure to register as a sex offender, and driving while intoxicated. Beltran admitted that he was originally charged with aggravated sexual assault of a child in the earlier indecency case and that he "pled to that offense and . . . actually pled guilty to indecency with a child by contact." He also testified that T.W. used to threaten to have him arrested based on his prior convictions, stating that when he called the police about her assaultive behavior, she threatened to tell the police that he was a registered sex offender. Beltran admitted to spanking A.B., including with a belt, and to choking T.W. during a fight, and said he knew that A.B. had "reported that 'daddy choked mommy and tried to send mommy to the angels.'" He did not know why A.B. was falsely accusing him of sexual abuse and said the only reason he could think of was one occasion when he got angry after she soiled herself.

---

[3] Beltran's attorney and the prosecutor had agreed on a pretrial motion in limine that they would not "go into the defendant's priors without approaching."

Beltran called his sister to testify, and she said she had heard T.W. threaten to call the police and have Beltran arrested because of his past record as sex offender. She also said T.W. had threatened to have her arrested for abusing T.W.'s sons.

*Discussion*

Beltran first argues that he received ineffective assistance because counsel did not object to testimony that Beltran yelled at and hit his children, spanked A.B. with a belt, yelled at A.B. for a long time, choked T.W. and tried to "send [her] to the angels," and frequently appeared in A.B.'s nightmares beating her with a belt. Although Beltran argues that counsel's failure to object was not part of a sound trial strategy, he admits that counsel's overall trial strategy was to argue that T.W. had persuaded A.B. to falsely accuse him of sexual assault. However, he contends that this strategy would have been more effective without evidence regarding his extraneous bad acts.

First, Beltran has not shown that counsel's strategy was unsound or that it was unreasonable to believe that the jury might have viewed evidence about Beltran's violence towards his family members as giving T.W. and A.B. motive to make false accusations. Nor is it clear that counsel was only using that one strategy. Finally, counsel could reasonably have believed that at least some of the evidence was admissible under the code of criminal procedure, which allows evidence of other crimes or bad acts committed by the defendant against the alleged child victim to show (1) the state of mind of the defendant and the child and (2) the relationship between the defendant and child. *See* Tex. Code Crim. Proc. Ann. art. 38.37, § 2 (West Supp. 2012). Beltran has not shown that counsel's performance related to evidence of other bad acts fell below an objective standard of reasonableness. *See Bone*, 77 S.W.3d at 833.

5

Beltran next argues that counsel was ineffective because he elicited testimony from T.W. about Beltran's prior convictions and that opening the door to testimony about his prior convictions was not a part of a sound trial strategy. He argues that counsel could have established that T.W. had previously threatened to have him arrested without eliciting testimony about his criminal history. He also contends that counsel was ineffective in calling Beltran to testify, arguing that it did not further his case, there was no significant advantage to be gained, and any potential advantage was substantially outweighed by the disadvantage of exposing him to cross-examination regarding his prior convictions. He argues that the only potential value of his testimony was to allow him to deny A.B.'s allegations, which was accomplished when he entered his not-guilty plea.

Counsel specifically told the court that his asking T.W. about Beltran's prior convictions was part of his trial strategy. Although counsel did not specify exactly what his strategy was, it is reasonable to conclude that counsel might have wanted to bring out this information to show that Beltran was being honest and was not trying to hide his criminal history, rather than risking vague answers that could lead the jury to believe Beltran was concealing something. Further, in counsel's closing argument, he argued that A.B. was persuaded by her mother to make false accusations against Beltran and that T.W. had "used [Beltran] being a sex offender as a way to keep control over [him] and hold that over his head."

Having Beltran testify could reasonably have been part of counsel's strategy to show the jury that Beltran was not attempting to hide his past wrongdoings and to allow Beltran to explain the circumstances of his prior convictions. It also meshed with counsel's defensive theory that T.W. persuaded A.B. to make false accusations, pointing to T.W.'s past behavior of holding Beltran's sex-offender status against him when angered. The fact that an alternate trial strategy could have been

6

used does not establish that counsel was ineffective. *See Damian v. State*, 881 S.W.2d 102, 110 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). Based on this record, Beltran has not shown that counsel's conduct was not the product of a sound strategic or tactical decision or was so outrageous that no competent attorney would have engaged in such conduct. *See Morales*, 253 S.W.3d at 696-97. Because Beltran has not shown that counsel's performance fell below an objective standard of reasonableness, *see Bone*, 77 S.W.3d at 833, we overrule Beltran's first issue.

## Admission of Expert Witness Testimony

In his second issue, Beltran contends that the trial court committed reversible error in overruling his objections and allowing Dr. William Carter to testify as an expert witness.

### *Standard of Review*

We review a trial court's admission of expert testimony under an abuse of discretion standard. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). "Such rulings will rarely be disturbed by an appellate court." *Jessop v. State*, 368 S.W.3d 653, 689 (Tex. App.—Austin 2012, no pet.). A court abuses its discretion if it acts without reference to any guiding rules and principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). The trial court is given a "limited right to be wrong" as long as it does not act in an arbitrary or capricious manner. *Id.* We will not reverse unless we determine that the trial court's ruling was so wrong as to fall outside the zone within which reasonable people might disagree. *Tillman*, 354 S.W.3d at 435; *Jessop*, 368 S.W.3d at 689. Expert testimony is admissible if the party offering the testimony proves that it is relevant and based on a "reliable scientific foundation." *Tillman*, 354 S.W.3d at 435. We ask whether the evidence will

assist the jury and is "'sufficiently tied to the facts of the case,'" meaning the expert must attempt to "'tie pertinent facts of the case to the scientific principles which are the subject of his testimony.'" *Id.* at 438 (quoting *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)).

If the evidence was relevant and based on a proper scientific foundation, we next weigh its probative value against its prejudicial effect. *Jessop*, 368 S.W.3d at 694. The rules of evidence favor "the admission of relevant evidence and [carry] a presumption that relevant evidence will be more probative than prejudicial," and we recognize that "[a]ll testimony and physical evidence are likely to be prejudicial to one party or the other." *Id.* Instead, we will only exclude evidence that carries the danger of unfair prejudice, meaning a tendency to lead the jury to make a decision on an improper basis. *Id.* "[O]nly when there exists a clear disparity between the degree of prejudice produced by the offered evidence and its probative value" will rule 403 require exclusion of relevant evidence. *Id.*; *see* Tex. R. Evid. 403.

*Factual Background*

After the defense rested its case-in-chief, the State called Dr. Carter as a rebuttal witness. Carter specializes in the treatment and evaluation of sexual abuse victims and testified about general patterns of sexual offenders and their victimization of children; Carter had no specific knowledge of the case. Before Carter began to testify before the jury, Beltran's counsel took him on voir dire and objected to several issues that the prosecutor said she intended to raise during Carter's testimony, including testimony about whether sex offenders tend to minimize and deny later offenses and to his opinion that a person would be more likely to sexually assault a child if his father had committed a similar offense. Counsel argued that testimony about the truthfulness

8

of sex offenders was more prejudicial than probative and would go "beyond what is legally permissible" if it referenced "research [that] this particular person or this particular class of persons is less credible than another class of persons." Beltran also specifically objected to testimony that someone with a sex offender for a father was statistically more likely to be a sex offender himself or that such offenses run in families, saying it was impermissible to allow testimony that invited the jury to think that "his daddy did it, so he did it, too." The trial court overruled Beltran's objections and allowed Carter to testify.

Carter was asked by the prosecutor:

> Let me give you a hypothetical . . . [a] grandfather perpetrates on a child, subsequently confesses to that and is convicted, as well as a son has perpetrated on another child who was approximately 12 years old. Does that tell you anything abut what kind of an environment a child would experience—or what a child would experience if they were brought into such an environment?

Beltran's attorney objected that any probative value was outweighed by the danger of unfair prejudice, *see* Tex. R. Evid. 403, and the trial court overruled the objection. Carter answered, "What you are speaking of is suggestive of a . . . family system where sex and sexuality is inappropriately expressed. That would suggest and leave open the possibility that a child born into that world is more vulnerable than not." He also said such an environment could "have an impact on her willingness to tell" if she was abused. Carter was then asked over Beltran's relevance objection, *see id.* R. 402, whether there were any studies showing a correlation of sexual abuse in a family in which a father and son are both known to have committed abuse. Carter replied:

> What I would say there is that if there is sexual deviance within various male members, . . . the more vulnerable the child is. I can't say that because one man

9

sexually abuses, all other men in the family system are going to sexually offend as well. But when you see patterns and characteristics like that within family systems, it suggests that sexuality is inappropriately expressed within that system and that a child pulled into that system is more vulnerable than not.

Carter was reminded that both Beltran and his father were convicted sex offenders and was asked whether there was a correlation. He answered, "Yes, I think you can say there is a connection here." Beltran objected, arguing, "I believe the last question went way, way over the line of what is permissible for any expert witness to testify. That is flat out saying he did it because his daddy did it, that's ground for mistrial." The prosecutor noted that Beltran's prior conviction was already "out there," and the trial court said, "Actually the only reason the conviction came in was to impeach him."[4] The State responded, "He pretty much let me have open reign [sic]," and the trial court said, "I agree. It is overruled."

*Discussion*

Beltran argues that admission of Carter's testimony was erroneous because evidence of a person's character is not admissible for the purpose of proving action in conformity with that character trait on a particular occasion, nor is evidence of crimes, wrongs, or other acts admissible to prove that a person acted in conformity with such evidence. *Id*. R. 404(a), (b). Beltran does not attack the scientific reliability or relevance of Carter's testimony and instead argues that Carter's testimony violated the Texas Constitution and the code of criminal procedure by implying that

---

[4] Beltran points to this statement by the trial court to support his assertion that the court admitted evidence of his prior convictions "for the limited purpose of allowing the State to attack [Beltran's] credibility as a witness." However, the record does not support the trial court's statement. Beltran introduced evidence of his prior convictions, as discussed earlier, and that evidence was not admitted over Beltran's objection or with limiting instructions or cautions.

Beltran sexually assaulted A.B. because both he and his father were convicted sex offenders. Thus, we need only consider whether Carter's testimony might have led the jury to decide Beltran's guilt on an improper basis and whether there was "a clear disparity between the degree of prejudice produced by the offered evidence and its probative value." *Jessop*, 368 S.W.3d at 694.

The State called Carter to testify generally to the patterns of sexual offenders and how these offenders typically victimize children. Carter stated that he never interviewed A.B., Beltran, or any of the other witnesses and that his purpose was to help the jury to understand the nature and dynamics of sexual abuse. Carter answered hypothetical questions based on this case but did not make any specific statements about Beltran's character or his acts, instead explaining the general patterns and pathology often found in sex offenders and their families. In his brief, Beltran does not explain how Carter's testimony about statistical correlations in families with sex offenders or the vulnerability of a child born into such a family carried with it "unfair prejudice" or how there was a "clear disparity" between its probative value and its degree of prejudice. *See id.* Beltran simply sets out the standard to be applied when reviewing the admission of such evidence and concludes that "it cannot be said with fair assurance that the aforseaid testimony . . . did not influence the jury, or had but a slight effect." The fact that Carter's testimony was unfavorable to Beltran does not mean it carried a risk of unfair prejudice. *See id.*; *see also Peters v. State*, 31 S.W.3d 704, 720-21 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (prejudicial effect of testimony about recidivism rates for incest offenders did not substantially outweigh probative value, thus trial court erred in excluding proffered testimony); *Kos v. State*, 15 S.W.3d 633, 641-42 (Tex. App.—Dallas 2000, pet. ref'd) (prejudicial potential of testimony about how "'seduction type' preferential offender" comes to control victim did not outweigh probative value).

11

The trial court could have concluded that this kind of information, even when tied to facts drawn from the case, would be helpful to the jury in its deliberations of the evidence. *See* Tex. R. Evid. 702. The record reflects that the trial court attempted to hew to the guiding principles set out in the rules of evidence, and we conclude that the court did not abuse its discretion in determining that the testimony was more probative than prejudicial and therefore within the bounds of rule 404. *See id.* R. 404. Therefore, we overrule Beltran's second issue.

## CONCLUSION

We have overruled Beltran's issues on appeal. We therefore affirm the trial court's judgment of conviction.

_____

David Puryear, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed

Filed:   December 21, 2012

Do Not Publish