**UNITED STATES of America, Appellee,**

v.

**Trevor DENNIS, Appellant.**

**No. 715, Docket 87–1430.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 26, 1988.

Decided April 1, 1988.

William F. Dow, III, New Haven, Conn. (William M. Bloss, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, Conn., of counsel), for appellant.

Douglas S. Lavine, New Haven, Conn. (Stanley A. Twardy, Jr., U.S. Atty., District of Conn., of counsel), for appellee.

Before OAKES, NEWMAN and MINER, Circuit Judges.

OAKES, Circuit Judge:

Trevor Dennis appeals his conviction for conspiracy to distribute cocaine entered in the United States District Court for the District of Connecticut, Ellen Bree Burns, Judge. He argues that the trial judge improperly limited the cross-examination of one of the two principal government witnesses as to the substance of a pretrial conversation he had had with Dennis's attorney.[1] Because we think the cross-examination should not have been so limited, we remand for further findings and for the possible grant of a new trial.

## BACKGROUND

This case began when a South Carolina state trooper stopped a speeding car on Interstate Highway 95 in Sumter County, South Carolina. Carlston Pilgrim, a national of Barbados, was the driver of the car and James Brown, a Jamaican-born resident of Hartford, Connecticut, the sole passenger. The state trooper determined that the car had been rented in Connecticut, that neither Pilgrim nor Brown was listed on the rental agreement, and that the odometer had only nine miles on it. He asked to search the car, and after Brown and Pilgrim consented, discovered packages of marijuana and cocaine in the car's trunk. Brown told an investigating Drug Enforcement Administration ("DEA") agent that the drugs were to be delivered to "Mackerel," who was later identified as Trevor Dennis. Brown recounted that he had been planning a trip to Florida to bring clothes, books, and supplies to a relative who would take them to his daughter in Jamaica. Shortly before he left Hartford for Florida, he went to buy a record at the

---

1. Dennis also argues that the trial court erred in denying his motion for a continuance after the Government disclosed that James Brown, another government witness, had changed his story. We disagree. The decision to grant or deny a requested continuance lies within the broad discretion of the district court, *Morris v. Slappy*, 461 U.S. 1, 11, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983), and will not be disturbed on appeal absent a showing that abuse of that discretion substantially impaired the defense. *United States v. King*, 762 F.2d 232, 235 (2d Cir.1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1203, 89 L.Ed.2d 316 (1986); *United States v. Rastelli*, 551 F.2d 902, 906 (2d Cir.), *cert. denied*, 434 U.S. 831, 98 S.Ct. 115, 54 L.Ed.2d 91 (1977). Here, Dennis's attorney was able to cross-examine Brown and the police officers and DEA agents who were misled by him. Moreover, Brown recanted only part of his story; he continued to assert that he obtained cocaine at Dennis's request. Therefore, even if a continuance would have been appropriate, no prejudice resulted.

Aquarius Record Shop, a store operated by Dennis. After making his purchase, he asked Dennis for directions to Florida. Dennis replied that Brown should come back the next day and he would have directions for him. Brown said that when he returned the following evening, Dennis offered him $700 to pick up a package for him in Florida and bring it to the Aquarius Record Shop. According to Brown, Dennis told him to pick up the package from a "tall black dude" in a red Ford Fairmont at a gas station parking lot in Miami on March 21, 1987. Pursuant to Dennis's instructions, Brown said he met an unidentified man at a Miami gas station who gave him the cocaine and marijuana. Brown told the DEA agent that when he returned to Hartford he was to call Dennis at the record store to arrange final delivery of the packages.

In return for dismissal of the state charges in South Carolina (which Brown and Pilgrim were told involved mandatory twenty-five-year prison terms), they agreed to deliver the drugs to "Mackerel," a/k/a Dennis. The DEA agent flew with Brown and Pilgrim to Hartford. Brown called the record shop and spoke briefly with Dennis. Connecticut DEA agents, concerned that delivery at the Aquarius Record Shop could not be adequately controlled, asked Brown to arrange for delivery of the drugs to Dennis in the parking lot of Valle's Steak House, a Hartford restaurant. Brown called a number that he said was the Aquarius Record Shop. A few minutes later Byron Edwards left the shop and went to Valle's, where DEA agents observed Brown give him a bag containing marijuana and phony cocaine. When confronted by the DEA agents, Edwards admitted that Dennis had sent him to meet Brown. The agents asked Edwards to deliver the narcotics to Dennis, but he refused, saying that Dennis "didn't send me for any drugs and I am not going to set him up for you."

Brown, Pilgrim, and Dennis were charged with conspiracy with intent to distribute cocaine in violation of 21 U.S.C. § 846 (1982). Brown pleaded guilty but was not sentenced until after Dennis's trial.

On the day before trial, Brown told DEA agents that he had lied when he had said that the man at the Miami gas station had given him marijuana to deliver to Mackerel. He admitted that in fact the marijuana was his. He told the agents and testified at trial that after dropping off his daughter's school supplies at a relative's home in Miami, he and Pilgrim drove to the home of Reginald Hudson, a childhood friend, who spontaneously gave them on credit fifteen pounds of marijuana, worth about $13,500 wholesale, to sell in Hartford. Brown admitted that he had initially told police that the marijuana as well as the cocaine was destined for Dennis in an effort to avoid criminal charges. He added that he had also encouraged Pilgrim to lie about the marijuana. On the morning trial was to begin, the Government informed defense counsel that Brown had lied about the marijuana. Defense counsel requested a continuance in order to investigate Brown's new story and interview Hudson. The court denied that request.

Brown's trial testimony was consistent with his most recent story to DEA agents. He repeated that the cocaine was for Dennis but that the marijuana was his. He stated that he had pled guilty to conspiracy to distribute cocaine and had not yet been sentenced. He said he understood that possible penalties included fifteen years' imprisonment and a $125,000 fine, and that, since he was not a United States citizen, he could be deported. Brown added that in return for his cooperation with DEA agents and his testimony, he was told that the charges in South Carolina would be dropped and that he would not be prosecuted for marijuana possession.

After the trial had begun, the Government dropped all charges against Pilgrim. He testified that he did not personally know Dennis, and admitted that he had lied to the police until Brown had told him to change his story.

Dennis's defense at trial was simply that Brown and Pilgrim had falsely implicated him in order to protect themselves. The

cross-examination at issue in this appeal involved an attempt by William Gerace, Dennis's attorney, to question Pilgrim about a conversation Gerace had had with him at his office. Gerace asked Pilgrim whether Pilgrim had made an appointment with him. Pilgrim replied that he had not, but that his parents had. Gerace asked whether Pilgrim had told Gerace a story during the meeting, and Pilgrim said he had. The prosecutor immediately objected and a long colloquy at the bench followed. The prosecutor argued that defense counsel Gerace was "putting his own credibility at issue" and that "to the extent [Pilgrim] may have consulted Mr. Gerace about any legal advice or discussed this case with him, I think that would be privileged." Gerace replied that although Pilgrim had asked Gerace to represent him, he, Gerace, terminated the discussion when he realized that Dennis, whom he already represented, and Pilgrim were defendants in the same case. He said he instructed Pilgrim

> very clearly I could not be his lawyer, in fact, that I would not be his lawyer, that I represented Mr. Dennis and now that that was terminated, if he chose to tell me what happened, he would be telling me as a witness and I would cross-examine him on it, and his father was there and his father agreed. They both told me the whole story....

Pilgrim's court-appointed counsel, Federal Public Defender Thomas Dennis, agreed with the prosecutor that Gerace was "heading ... towards a matter that's within the attorney/client privilege." Defense counsel Gerace reiterated that:

> As soon as [Pilgrim] came in and I realized it was the same case, I terminated the discussion. We brought his father from the waiting room and I told him I represented Mr. Dennis, could not represent him.
>
> I said he's an important witness in this case and if he chooses to tell me the story, I'll use it against him in court and he would be a witness. He proceeded to say, "I want to tell you what happened because I think there's nothing wrong with me telling you this." I had his

father there giving consent and him there, and I'm entitled....

At this point, the witness's attorney interrupted to say, "You didn't have me there.... He had a lawyer from the minute he hit the federal court building.... I was appointed to represent him on the first day." Defense counsel Gerace did not dispute that, but said that when Pilgrim came to see him, "he said he had no lawyer. He asked me for names." Gerace then suggested that "the problem could be solved by voir diring Mr. Pilgrim," and asked the court, "May the jury be excused and we'll inquire?" Pilgrim's lawyer interjected that defense counsel should have known that Pilgrim had a lawyer "because no more than a few days go by before a lawyer is either appointed or retained." Gerace replied that Pilgrim could have discharged his lawyer at any time, which, at the time of the interview, is what he believed Pilgrim had done. He reiterated that Pilgrim had been seeking counsel and, after Gerace had declined to represent him, had asked for names of other lawyers. After further colloquy, defense counsel Gerace said, "What the Court is then saying, if I have an out-of-court statement that is inconsistent, I cannot use it to cross-examine?" The court replied, "Under the circumstances, that's correct. I'll sustain the objection."

Defense counsel then said, "I guess I can call Mr. Lawrence [Pilgrim's father] then. Besides, there was no privilege when he spoke to me because his father was there." He added, "I am trying to make a record by asking Mr. Pilgrim that." The prosecutor objected and asked the court to instruct defense counsel that "he cannot comment ... or question directly or indirectly about anything having to do with this purported discussion ... in his office." The court said, "Well, I would think that would be clear from my sustaining the objection." Defense counsel once again asked whether he could establish in a private voir dire of Pilgrim that he had brought Pilgrim's father into the room thereby destroying any pretext of an attorney/client relationship. Judge Burns denied that request and stated she would assume that the father was

there. The court also denied Gerace's request to have Mr. Lawrence, Pilgrim's father, testify as to what Pilgrim had said to Gerace.

■ The Government, having successfully prevented defense counsel from cross-examining Pilgrim about his conversation with Gerace and from making a record as to the context or substance of the conversation (by having Pilgrim or his father testify out of the presence of the jury) now argues that trial counsel's failure to make an offer of proof as required by Fed.R.Evid. 103(a)(2) precludes the issue from being raised on appeal. It is true that at no point did defense counsel represent the content of Pilgrim's statements and that this court cannot accept self-serving statements in an appellant's brief as to the substance of allegedly inconsistent statements. *Fortunato v. Ford Motor Co.*, 464 F.2d 962, 969 (2d Cir.), *cert. denied*, 409 U.S. 1038, 93 S.Ct. 517, 34 L.Ed.2d 487 (1972). Nevertheless, we think it appropriate to address this issue, in that Dennis's failure to make an offer of proof was due in large measure to the district court's refusal to permit Pilgrim or his father to testify. As a result, the district court limited cross-examination of Pilgrim without sufficient factual findings.

■ None of the three grounds on which the Government successfully objected to the cross-examination was sound. First, it is correct that

[i]f counsel were to cross-examine the witness as to [his] conversations with him, argue the credibility of [his] testimony to the jury, or suggest alternative interpretations of [his] account of the conversation, [counsel] would place himself in the position of an unsworn witness and implicitly put his own credibility at issue.

*United States v. McKeon*, 738 F.2d 26, 35 (2d Cir.1984). Here, however, according to Gerace's undisputed representations to the court, defense counsel avoided placing himself in the position of an unsworn witness by bringing Pilgram's father into the room. In doing so, Gerace followed the American Bar Association standards for interviewing prospective witnesses:

Unless the lawyer for the accused is prepared to forgo impeachment of a witness by the lawyer's own testimony as to what the witness stated in an interview or to seek leave to withdraw from the case in order to present such impeaching testimony, the lawyer should avoid interviewing a prospective witness *except in the presence of a third person.*

American Bar Association Standards Relating to the Administration of Criminal Justice, Standard 4–4.3(d) (2d ed. approved Feb. 1979) (emphasis added). Gerace went beyond the requirements of the American Bar Association standards and cautioned Pilgrim that what he told Gerace could be used against Pilgrim on cross-examination. *Cf. id.*, Standard 4–4.3(b) ("It is not necessary for the lawyer or the lawyer's investigator, in interviewing a prospective witness, to caution the witness concerning possible self-incrimination and the need for counsel."). If on remand it appears that Gerace did bring Pilgrim's father into the room, anything that was said thereafter by Pilgrim to defense counsel certainly would not have put the lawyer's credibility at issue. However, even if counsel had assumed a role as an unsworn witness, *McKeon* makes clear that the appropriate remedy is disqualification, not exclusion of the testimony. 738 F.2d at 35.

■ The Government's argument that the testimony sought to be elicited was privileged is equally unavailing. While the district court can bar cross-examination of communication protected by an attorney/client privilege, *United States v. Gatzonis*, 805 F.2d 72, 74–75 (2d Cir.1986), *cert. denied*, —— U.S. ——, 108 S.Ct. 303, 98 L.Ed.2d 262 (1987), the existence of an attorney/client relationship was not established here. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 146–47 (2d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987). To be sure, initial statements made while Pilgrim intended to employ Gerace were privileged even though the employment was not accepted. *See McCormick on Evidence* § 88, at 179 (Cleary ed. 1972); 2 J. Wein-

stein & M. Berger, *Weinstein's Evidence* ¶ 503(a)(1)[01], at 503–19 (1986). But the privilege may have ended either when Gerace told Pilgrim he would not represent him and that further communications would be subject to cross-examination or when Pilgrim's father entered the room. The key, of course, to whether an attorney/client relationship existed is the intent of the client and whether he reasonably understood the conference to be confidential. *See United States v. Tellier,* 255 F.2d 441, 447 (2d Cir.), *cert. denied,* 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958). If the client understood that the attorney refused to act for him and that the attorney was retained by another person in an adverse position, the privilege does not apply. 8 J. Wigmore, *Evidence* § 2304, at 587 (McNaughton rev. 1961) ("[I]f the client continues his communication after the attorney's refusal to act for him, or if a person knowingly attempts to retain one who is already retained by the opponent and therefore was not retainable by the consultant, he does not need or deserve the protection of the privilege."). On remand, the trial court should make a factual determination as to whether an attorney/client relationship existed, whether Pilgrim understood that it was terminated, and whether, in light of his father's presence, he expected that the material would be confidential.

■ The third basis on which the court may have ruled was the Government's objection, as seconded by Pilgrim's appointed counsel, that Gerace's communication with his client's codefendant constituted an interference with the codefendant's attorney/client relationship. If Gerace violated ethical standards by communicating with a party he knew was represented by another lawyer, *see* Model Code of Professional Responsibility DR 7–104(A)(1) (1981); Model Rules of Professional Conduct 4.2 (1987), or by giving advice other than advice to secure counsel to a party that he thought was unrepresented, Model Code DR 7–104(A)(2); *cf.* Model Rule 4.3, the sanction, absent some serious prejudice to the witness or taint to the trial, should be disciplinary action, not a limitation of the cross-ex-

amination. *Cf. W.T. Grant Co. v. Haines,* 531 F.2d 671, 676–77 (2d Cir.1976) (dismissal of complaint is inappropriate remedy for violation of DR 7–104(A)(2)); *Lefrak v. Arabian American Oil Co.,* 527 F.2d 1136, 1141 (2d Cir.1975) (trial judge should not perform function of bar association's grievance committee). As we said in *W.T. Grant Co.,* "The business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it." 531 F.2d at 677.

■ We do not by any means intend to pre-judge the district court's factual findings relative to Pilgrim's statement to defense attorney Gerace. However, if the court finds that Pilgrim did not expect his statements to be confidential either because Gerace informed him that he could not represent him or because Pilgrim's father was present in the room, then Gerace should be permitted to establish what Pilgrim's testimony would have been. If the district court finds that his testimony tended to establish that Brown and Pilgrim had falsely implicated Dennis, thereby bolstering Dennis's defense, then the district court's limitation on Pilgrim's cross-examination violated Dennis's rights under the Confrontation Clause. *See Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974). In that case, the court should order a new trial at which Pilgrim's testimony would be admissible. If, on the other hand, the court finds that Gerace's representations concerning the interview were not true or that the testimony as developed would not have aided the defense, the court may decline to order a new trial. We retain jurisdiction for the limited purpose of reviewing the district court's findings in the event of a subsequent appeal.

Case remanded in accordance with opinion.