958 So.2d 314 (2006)
Ex parte Father Paul G. ZOGHBY
(In re: Linda Ledet
v.
Catholic Archdiocese of Mobile et al.).
No. 1050959.
Supreme Court of Alabama.
November 9, 2006.
*316 Vincent F. Kilborn III, David A. McDonald, and W. Perry Hall of Kilborn, roebuck and McDonald, Mobile, for petitioner.
Richard H. Holston and W. Lloyd Copeland of Taylor-Martino-Kuykendall, Mobile, for respondent.

PETITION FOR WRIT OF MANDAMUS
STUART, Justice.
Father Paul G. Zoghby petitions this Court for a writ of mandamus directing the trial court to vacate its order granting Linda Ledet's motion to compel discovery of documents relating to psychological counseling Zoghby underwent. We deny the petition.

Facts
Linda Ledet and her husband and children were parishioners at St. Mary's Catholic Church in Mobile from 1995 through 2001. During that time, Zoghby, who was an associate priest at St. Mary's at that time, developed a friendship with Ledet. According to Ledet, in late 1997 Zoghby began making improper and unwelcome advances toward her, including attempting to physically embrace her in an intimate or sexual manner, touching her on intimate parts of her body in a sexual manner, making lewd and sexually suggestive comments to her, exposing his genitalia to her, and attempting to force her, physically and by command as a priest, to engage in sexual relations with him.
During the summer of 2002, after attending a meeting described as an "open invitation to victims of abuse" sponsored by the Catholic Archdiocese of Mobile, Ledet filed a formal written complaint with the Archdiocese, asserting claims of sexual misconduct against Zoghby. This complaint was reviewed by Archbishop Oscar Lipscomb and Chancellor Michael Farmer.[1] In his deposition testimony, Archbishop Lipscomb explained that when allegations of sexual misconduct are made, the Archbishop is responsible for directing the investigation into the alleged misconduct for the Archdiocese and for making a judgment and disposing of the complaint. He stated that because Ledet requested strict confidentiality in this matter, he investigated her claims himself.
Archbishop Lipscomb stated that when he began his investigation and confronted Zoghby about Ledet's allegations, Zoghby denied the alleged misconduct and in a written response to Ledet's complaint accused Ledet of improper conduct, mental instability, and untruthfulness. Archbishop Lipscomb indicated that when he considered Zoghby's oral denial and his written response, he questioned Zoghby's veracity, stating: "I just thought he wasn't telling the truth. It appeared that way from her description of things and from his responses. . . . I've had experience in people telling me the truth. And  it did not [appear to be] the whole truth." In September 2002, when Archbishop Lipscomb again confronted Zoghby about the allegations and his response, Zoghby recanted his *317 false allegations against Ledet and admitted his misconduct.
After Zoghby admitted his misconduct, the Archdiocese, acting through Archbishop Lipscomb, attempted to resolve Ledet's complaint. Archbishop Lipscomb explained that in resolving an issue of sexual misconduct by a priest in his Archdiocese he first addressed the needs of the victim; he then tried to
"deal with the perpetrator to see is he salvageable and what are the conditions under which you might approach a return to some kind of active ministry. Because [the perpetrator] was going to be out of [the active ministry] for a good long period as a result of [the accusation]."
He stated that to resolve the complaint in this case the Archdiocese entered into an agreement with Ledet pursuant to which the Archdiocese agreed to pay for the therapeutic counseling and treatment necessary to enable her and her family to recover from the emotional and mental trauma of Zoghby's actions. The Archdiocese further promised Ledet that Zoghby would receive intensive therapy and counseling and that Zoghby would not be placed in a position where he could further harm others. As part of the agreement, Ledet and her family agreed to remain silent about Zoghby's actions, to not publicize the accusations against Zoghby, and to refrain from filing civil litigation against the parties involved.
In 2003 Ledet learned that Zoghby had returned to active ministry and that he had been "promoted" to the position of pastor over a parish in Foley. She also began "to question" whether Zoghby was actually receiving the therapy and counseling mandated by the agreement. According to Ledet, when she notified Archbishop Lipscomb that she believed the Archdiocese had not fulfilled its part of the agreement, Archbishop Lipscomb threatened her, "stating that publicity surrounding Zoghby's actions would be harmful to her and to her husband and children and that it would destroy [her] reputation."
The revelations that Zoghby had not received treatment and that he had been promoted to the position of pastor of a parish triggered "emotional trauma" in Ledet. She underwent treatment for this trauma at several facilities. When she presented the bills for her treatment to the Archdiocese for payment, the Archdiocese refused to pay.
In 2004, Ledet sued the Archdiocese, Archbishop Lipscomb, and Chancellor Farmer, alleging breach of contract and the tort of outrage. Ledet did not name Zoghby as a defendant.
As discovery progressed, Ledet learned that Zoghby had received some counseling under the supervision of Father Benedict Groeschel at Trinity Retreat, a Catholic counseling center in New York state that is connected with a psychiatric hospital, and that Zoghby had authorized the release of the records resulting from that counseling to Archbishop Lipscomb. Ledet requested that the Archdiocese produce all psychiatric records and reports relative to Zoghby's treatment, including "complete and correct" copies of all psychological and psychiatric testing. The defendants objected, alleging confidentiality and privilege.
Although not a party to the action, Zoghby also objected to Ledet's production request, claiming that the records of his treatment at Trinity Retreat were privileged under both the psychotherapist-patient privilege, see Rule 503, Ala. R. Evid., and the privilege accorded communications to clergy, see Rule 505, Ala. R. Evid. In support of his objection, Zoghby submitted an affidavit in which he explained the circumstances *318 of his counseling and the confidentiality he understood attached to his release to Archbishop Lipscomb of the documents relating to that counseling. Zoghby averred:
"I have known Archbishop Oscar H. Lipscomb for many years and he is both my bishop and a spiritual advisor. I have entrusted to him many confidential matters over the years concerning my vocation and calling into the priesthood, and I have had many private discussions with him concerning my spiritual growth and discernment and I have always expected these matters of utmost trust would remain confidential. I am certain he feels the same way.
"In the year 2002 and 2003, I participated in counseling with the Archbishop and signed a release authorizing my counselor to send to and give the Archbishop access to my counseling records in order to assist the Archbishop in giving me personal and spiritual guidance. I do not have these records in my personal possession. I simply released them to the Archbishop as a substitute for me getting the records and then forwarding them to the Archbishop. I am generally familiar with the clergyman's privilege since I am a priest myself. My communications with the Archbishop and my authorization for records to be released directly to the Archbishop constitute communications to the Archbishop in his professional capacity, as my bishop and a spiritual advisor. In my opinion, the communications are covered by the clergyman's privilege. They were made privately and it was not intended that the communications and the records related thereto be further discussed or given to any other person. The sole purpose of the communications with the Archbishop [was] to advise me as my bishop and a spiritual advisor."
Ledet moved to compel discovery of the records, claiming Zoghby had waived the psychotherapist-patient privilege by authorizing the release of the documents to Archbishop Lipscomb. Ledet further argued that the released documents were not protected by the clergyman privilege because, she maintained, the documents were not released to Archbishop Lipscomb in his professional capacity as Zoghby's spiritual advisor, but in his capacity as an administrator for the Archdiocese, investigator of her complaint alleging misconduct, and enforcer of the agreement she had entered into with the Archdiocese.
In support of her motion, Ledet submitted excerpts from Archbishop Lipscomb's deposition, in which Archbishop Lipscomb explained his relationship with Zoghby and his role in the investigation of her complaint against Zoghby. Archbishop Lipscomb stated that he was a close friend of Zoghby's, that he considered himself to have played a significant role in Zoghby's choosing and pursuing the priesthood, and that he was hurt when Zoghby lied to him during the investigation. Archbishop Lipscomb further explained that his discussions with Zoghby during and after the investigation did not address spiritual matters and that he did not consider himself to be Zoghby's spiritual advisor. Specifically, he stated that Zoghby did not engage in a spiritual confession to him and that he was not Zoghby's mentor. He admitted that "[he and Zoghby] obviously have discussed things that [he] thought were necessary for [Zoghby's] healing, and we obviously have discussed a program and the place where that would take . . . place. And since [Zoghby's] return, obviously, we have discussed his role in the parish and my expectations for it." Indeed, Archbishop Lipscomb explained his role in the process as follows:

*319 "[Counsel]: And you were able to get help for Father Zoghby.
"[Archbishop Lipscomb]: That too.
"[Counsel]: And you were able to get him help so that he can go back in the priesthood.
"[Archbishop Lipscomb]: Obviously, it required [that I] see a change in his life."
Archbishop Lipscomb stated that while Zoghby was being treated in New York, he visited New York on other business and arranged to have a conversation with Zoghby to inquire about how "things" were going. He explained that after Zoghby returned to Alabama, he secured, through a release from Zoghby, the requested documents from Father Groeschel and the treatment facilities in New York. He stated that he relied heavily on the summary of the treatment and the recommendations of Father Groeschel and the doctor in charge of Zoghby's professional treatment in New York when he decided to promote Zoghby to pastor of his own parish.
The trial court granted Ledet's motion to compel and entered the following order:
"(1) As to [Ledet's] motion to compel Defendants to produce psychological treatment records of non-party Zoghby, and the objections filed by Defendants and non-party Zoghby to the production of such records, the court has reviewed the document[s] at issue in camera and grants [Ledet's] motion and overrules the objections, solely for the purposes of discovery. Defendants are ordered to produce the document[s] at issue within 10 days of this order; however, the production is subject to the non-disclosure agreement previously entered into by counsel for [Ledet] and Defendants. . . .
"(2) As to [Ledet's] motion for an order suspending the Agreement of Non-Disclosure, the motion is denied.
"(3) As to Defendants' motion for protective order and to enforce non-disclosure agreement, the motion for protective order is denied, and the motion to enforce the non-disclosure agreement is granted. . . . "
Standard of Review
"Mandamus is an extraordinary remedy and will be granted only when there is `(1) a clear legal right in the petitioner to the order sought, (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so, (3) the lack of another adequate remedy, and (4) properly invoked jurisdiction of the court.' Ex parte Alfab, Inc., 586 So.2d 889, 891 (Ala.1991). In Ex parte Ocwen Federal Bank, FSB, 872 So.2d 810 (Ala.2003), this Court announced that it would no longer review discovery orders pursuant to extraordinary writs. However, we did identify four circumstances in which a discovery order may be reviewed by a petition for a writ of mandamus. Such circumstances arise (a) when a privilege is disregarded, see Ex parte Miltope Corp., 823 So.2d 640, 644-45 (Ala.2001); (b) when a discovery order compels the production of patently irrelevant or duplicative documents the production of which clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit received by the requesting party, see, e.g., Ex parte Compass Bank, 686 So.2d 1135, 1138 (Ala.1996); (c) when the trial court either imposes sanctions effectively precluding a decision on the merits or denies discovery going to a party's entire action or defense so that, in either event, the outcome of the case has been all but determined and the petitioner would be merely going through the motions of a trial to obtain an appeal; or *320 (d) when the trial court impermissibly prevents the petitioner from making a record on the discovery issue so that an appellate court cannot review the effect of the trial court's alleged error. The burden rests on the petitioner to demonstrate that its petition presents such an exceptional case  that is, one in which an appeal is not an adequate remedy. See Ex parte Consolidated Publ'g Co., 601 So.2d 423, 426 (Ala.1992)."
Ex parte Dillard Dep't Stores, Inc., 879 So.2d 1134, 1136-37 (Ala.2003).

Legal Analysis
Zoghby contends that the trial court exceeded the scope of its discretion in ordering the discovery of his psychiatric records and reports because, he says, the documents are privileged pursuant to Rules 503 and 505, Ala. R. Evid. According to Zoghby, the trial court's order ignores the fact that "the Alabama Rules of Civil Procedure recognize the importance of preserving confidential relationships and confidential information arising therefrom by providing that privileged matters are not subject to discovery." See Ex parte Rudder, 507 So.2d 411, 413 (Ala.1987).
"Discovery matters are within the trial court's sound discretion, and this Court will not reverse a trial court's ruling on a discovery issue unless the trial court has clearly exceeded its discretion." Ex parte Ocwen Fed. Bank, FSB, 872 So.2d 810, 813 (Ala.2003). "Whether a communication is privileged is a question of fact to be determined by the trial court from the evidence presented. . . ." Ex parte DCH Reg'l Med. Ctr., 683 So.2d 409, 412 (Ala. 1996). The standard for reviewing a trial court's ruling on a privilege issue is whether the trial court exceeded the scope of its discretion. Exxon Corp. v. Department of Conservation & Natural Res., 859 So.2d 1096, 1103 (Ala.2002).
Ledet and Zoghby both agree that the requested discovery was initially protected from disclosure by the psychotherapist-patient privilege. See Rule 503, Ala. R. Evid. Ledet and Zoghby, however, disagree on whether, by releasing the documents to Archbishop Lipscomb, Zoghby waived the psychotherapist-patient privilege.
Zoghby contends, however, that the documents are also protected from disclosure by the privilege accorded communications to the clergy because, he says, the release of the documents was made to Archbishop Lipscomb in his "professional capacity and in a confidential manner." Therefore, Zoghby maintains that Archbishop Lipscomb has "the privilege to refuse to disclose, and to prevent another from disclosing, that confidential communication." Rule 505(b), Ala. R. Evid.
Ledet argues that the clergyman privilege does not protect from disclosure the documents she seeks because, she says, at the time Zoghby authorized the documents to be released to Archbishop Lipscomb, Archbishop Lipscomb was not functioning in his professional capacity as Zoghby's spiritual advisor; rather, he was functioning in his administrative capacity as the investigator of Ledet's claims and the enforcer of the Archdiocese's agreement resolving Ledet's initial complaint against Zoghby.
"The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." Trammel v. United States, 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980).
Rule 505(b), Ala. R. Evid., provides:
"If any person shall communicate with a clergyman in the clergyman's professional *321 capacity and in a confidential manner, then that person or the clergyman shall have a privilege to refuse to disclose, and to prevent another from disclosing, that confidential communication."
Thus, for a communication with a clergyman to be privileged, the communication must be made 1) to a clergyman 2) "in the clergyman's professional capacity" and 3) "in a confidential manner." Rule 505(b), Ala. R. Evid.
Clergyman is defined in Rule 505(a)(1) as
"any duly ordained, licensed, or commissioned minister, pastor, priest, rabbi, or practitioner of any bona fide established church or religious organization; the term `clergyman' includes, and is limited to, any person who regularly, as a vocation, devotes a substantial portion of his or her time and abilities to the service of his or her church or religious organization."
Additionally, "[a] communication is `confidential' if it is made privately and is not intended for further disclosure except to other persons present in furtherance of the purpose of the communication." Rule 505(a)(2), Ala. R. Evid.
Rule 505, however, does not define the phrase "in the clergyman's professional capacity." Before the promulgation of Rule 505, Ala. R. Evid., the clergyman privilege was limited in scope to communications made in a confessional or of marital nature. See Santmier v. Santmier, 494 So.2d 95, 97 (Ala.Civ.App.1986) (recognizing that the "priest-penitent" communication must involve "making a confession or seeking spiritual counsel or comfort or advice or help with a marital problem"). Rule 505, however, abrogated such limitations to the broader realm of communications made to a clergyman "in the clergyman's professional capacity." Thus, we must give effect to the words "in the clergyman's professional capacity."
"`"[T]he construction of rules of court are for the court which promulgated them." Alabama Public Serv. Comm'n v. Redwing Carriers, Inc., 281 Ala. 111, 115, 199 So.2d 653, 656 (1967). "We start with the basic premise that words used in court rules must be given their plain meaning." Nieto v. State, 842 So.2d 748, 749 (Ala.Crim.App.2002). In construing a rule promulgated by this Court, effect must be given to "each word, phrase, and clause." State v. Old West Bonding Co., 203 Ariz. 468, 471, 56 P.3d 42, 45 (Ct.App.2002).'"
Ex parte Haynes Downard Andra & Jones, LLP, 924 So.2d 687, 692 (Ala.2005) (quoting Southeastern Meats of Pelham, Inc. v. City of Birmingham, 895 So.2d 909, 913 (Ala.2004)).
First, we consider the plain meaning of the words in the phrase "in the clergyman's professional capacity." A "profession" is "a calling requiring specialized knowledge and often long and intensive academic preparation." Merriam-Webster's Collegiate Dictionary 991 (11th ed.2003). "Capacity" is defined as "duty, position, role." Merriam-Webster's Collegiate Dictionary at 182. While "clergyman" is defined in Rule 505, the definition of "clergyman" in Rule 505 does not assist in determining the vocation of the clergy. "Clergy" is defined as "a group ordained to perform pastoral . . . functions" in a religious organization. Merriam-Webster's Collegiate Dictionary at 230. "Pastoral" is defined as "of or relating to spiritual care or guidance esp. of a congregation." Merriam-Webster's Collegiate Dictionary at 907.
In Nussbaumer v. State, 882 So.2d 1067 (Fla.Dist.Ct.App.2004), the Florida Court of Appeals addressed the requirement in *322 Florida for the clergyman privilege to apply that the communication be made to a clergyman "in the usual course of his or her practice or discipline," which is similar to the requirement in Alabama that the communication be made to the clergyman "in the clergyman's professional capacity." Recognizing that the language "in the usual course of his or her practice or discipline" was made part of the requirement to expand the scope of the privilege beyond the traditional confessional, the court held that a communication with a pastor during pastoral counseling satisfied the requirement that the communication was made in the usual course of the pastor's practice.
In reaching its holding, the Nussbaumer court noted:
"The clergy communications privilege does not apply unless the confider consults the member of the clergy `for the purpose of seeking spiritual counsel or advice.' § 90.505(1)(b) [Fla. Statutes (2003)]. No reported Florida decisions address this requirement of the privilege. Courts from other jurisdictions have interpreted similar statutory provisions to exclude from the operation of the privilege communications made for purposes not related to religious or spiritual concerns. E.g., Magar v. State, 308 Ark. 380, 826 S.W.2d 221 (1992) (finding privilege inapplicable to defendant's admission to minister's accusation of sexual abuse of minors where conversation was initiated by minister for disciplinary purposes and not for spiritual counseling); Burger v. State, 238 Ga. 171, 231 S.E.2d 769 (1977) (holding defendant could not claim privilege concerning conversational statements to clergy member who was his friend and frequent companion concerning defendant's intent to kill his wife and her lover); Keenan v. Gigante, 47 N.Y.2d 160, 417 N.Y.S.2d 226, 390 N.E.2d 1151 (1979) (finding privilege inapplicable to defendant's communications to priest where the communications were made for purpose of securing defendant's entrance into a work release program). The common thread in such cases `is that the privilege may not be invoked to enshroud conversations with wholly secular purposes solely because one of the parties to the conversation happened to be a religious minister.' People v. Carmona, 82 N.Y.2d 603, 606 N.Y.S.2d 879, 627 N.E.2d 959, 962 (1993)."
882 So.2d at 1075.
Thus, considering the plain meaning of the words in the phrase "in the clergyman's professional capacity" and the observations of the Nussbaumer court, we hold that the phrase means that the clergyman is serving in his professional capacity when he is serving as a specialist in the spiritual matters of his religious organization. In other words, the communication must be made to the clergyman in his role as a provider of spiritual care, guidance, or consolation to the individual making the communication. Whether a communication is made to a clergyman "in the clergyman's professional capacity" must be examined on a case-by-case basis.
Our interpretation of this phrase is supported by the Advisory Committee's Note to Rule 505, which provides:
"Section (b). General rule of privilege. The privilege arises only when the person communicates with a clergymen in the latter's professional capacity. A similar limitation is placed upon the attorney-client privilege when the client consults a lawyer for some purpose other than to secure legal advice. See Ala. R. Evid. 502(a)(1) advisory committee's notes. Communications to the clergyman in furtherance of a crime or a fraud would not qualify as seeking spiritual *323 advice and therefore would not fall within the protection of the privilege."
(Emphasis added.) See also Tankersley v. State, 724 So.2d 557, 560 (Ala.Crim.App. 1998), quoting Advisory Committee's Notes to Rule 505 (stating that "Rule 505 has explicitly broadened the scope of the privilege to include `all conferences where the clergyman is consulted in the professional capacity of spiritual advisor in the broadest sense'").
Here, the parties do not dispute that Archbishop Lipscomb is a clergyman, nor do they dispute that the disclosure to Archbishop Lipscomb of the documents Ledet seeks was made in a confidential manner. Therefore, our analysis focuses on whether the documents were disclosed to Archbishop Lipscomb while he was acting in his professional capacity as a spiritual advisor.
The facts before us establish that at the time Zoghby authorized the release of the documents to Archbishop Lipscomb, Archbishop Lipscomb had dual roles in the church  as a priest and as an administrator in the Archdiocese. Other jurisdictions have confronted situations similar to this one  a privilege is asserted when a communication is made to a clergyman who is serving both as a spiritual advisor and as an administrator.
In Magar v. State, 308 Ark. 380, 826 S.W.2d 221 (1992), the Supreme Court of Arkansas held that the trial court properly admitted evidence from a pastor; the clergyman privilege did not apply because the communication did not occur while the pastor was serving as a spiritual counselor. In Magar, the parents of two boys told the pastor that Magar, who worked in the music ministry of the church, had sexually abused their sons. The pastor confronted Magar, and Magar admitted that the allegations were true. The court held that even though the pastor and Magar had had counseling sessions before the incident that was the basis of the action, the communication at issue was "disciplinary in nature" and, therefore, was not protected by the privilege.
The Arkansas Supreme Court emphasized that each analysis of the applicability of the clergyman privilege must rest on the facts of the particular case, stating:
"Other courts have considered the privilege of religious communications and determined the applicability of the privilege on the facts of each case. Illustrative of the rationale denying the privilege are United States v. Gordon, 493 F.Supp. 822 (N.D. New York 1980) (citing Trammel v. United States, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)) (it was emphasized that the privilege between priest and penitent is limited to private communications, a privilege recognizing `the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return,' which facts and circumstances were not present where the challenged conversations related to business matters), and Burger v. State, 238 Ga. 171, 231 S.E.2d 769 (1977) (the ministerial privilege was not applicable to testimony of reverend, as witness for the state in a homicide prosecution, relating to conversational statements made to him by the defendant regarding the defendant's intent to kill his wife where the record showed that the statements by the defendant to which the witness testified were not made by the defendant in professing religious faith or seeking spiritual comfort or guidance).
"In comparison, the privilege was upheld in People v. Reyes, 144 Misc.2d 805, 545 N.Y.S.2d 653 (Supp.1989), where a *324 conversation between a priest and the defendant was a privileged communication, which the priest could not testify about before a grand jury, where the defendant was seeking some type of spiritual advice from the priest with the reasonable expectation that the conversation would be kept secret when the defendant went to the priest's church after a shooting."
308 Ark. at 383-84, 826 S.W.2d at 223.
In Bonds v. State, 310 Ark. 541, 837 S.W.2d 881 (1992), the Supreme Court of Arkansas again addressed the clergyman privilege, holding that the privilege did not apply to an admission by Bonds when the minister, who was also Bonds's employer, telephoned Bonds to determine if the allegations that Bonds had sexually abused a 13-year-old girl were true and if he should fire Bonds. The court held that because at the time of the communication there was no evidence of an ongoing counseling relationship between the minister and Bonds and the minister was acting as Bonds's employer, the minister was not acting in his professional capacity as a spiritual advisor, and the clergyman privilege did not apply.
In State v. Guthrie, 627 N.W.2d 401 (S.D.2000), the Supreme Court of South Dakota held that not every communication to a clergyman was privileged under South Dakota's clergy privilege, which provides an individual with a privilege to prevent disclosure of confidential statements made to a member of the clergy in his or her professional capacity as a spiritual advisor. In Guthrie, the communication occurred between an executive presbyter pastor and a subordinate pastor about an extramarital affair of the subordinate pastor. The court first focused on the subordinate pastor's intent in communicating with the executive presbyter pastor. The court concluded that although the subordinate pastor intended his conversation with the executive presbyter pastor to remain in confidence, the communication was not privileged because the evidence established that the communication was not made by the subordinate pastor when he was seeking spiritual advice or counseling from the executive presbyter pastor. The evidence established that the communication was made to assist the executive presbyter pastor in determining whether he should allow the subordinate pastor to continue in his position at the church. The court focused on the fact that the executive presbyter pastor initiated the communication about the subordinate pastor's affair and that after the communication the executive presbyter pastor permitted the subordinate pastor to remain in his position at the church. Because the facts established that when the communication was made the subordinate pastor was not seeking spiritual advice and the executive presbyter pastor was acting in his supervisory capacity, the court held that the communication was not privileged.
In Kos v. Texas, 15 S.W.3d 633 (Tex. App.2000), a case whose facts are similar to those in the case before us, the Texas Court of Appeals addressed whether the trial court properly admitted testimony from a Catholic priest regarding a communication the priest had had with another Catholic priest who had been accused of sexual misconduct. The accused priest claimed that the communication was privileged under the Texas clergyman privilege, which provides that confidential communications made by an individual to a clergy member in his professional capacity as a spiritual advisor are privileged. The communication occurred when the priest in his role as intervenor in cases where child abuse had been alleged confronted the accused priest about the abuse allegations. *325 The priest testified that the communications with the accused priest were not part of a "Catholic confession" by the accused priest and that the accused priest was not seeking spiritual advice. The priest further stated that at the time of the meeting he was not concerned about the state of the accused priest's soul but was focusing on conducting a "disciplinary intervention." The Texas Court of Appeals held that the communications were not privileged, stating:
"[The priest's] testimony indicates the statements [the accused priest] made during the September 1992 meeting were not made in an effort to obtain some sort of spiritual advice or guidance; to the contrary, the meeting was more in the nature of a disciplinary/administrative meeting, with [the priest] attempting to determine what to do in the face of the abuse allegations. We note, in this regard, that the communications between [the accused priest] and [the priest] were not initiated by [the accused priest]; rather, they were initiated by [the priest] for the specific purpose of obtaining information about the abuse allegations. Although it is true that [the clergyman-privilege rule] does not require for its application that the communicant be the one seeking, summoning, or soliciting the presence of the clergy, see Nicholson v. Wittig, 832 S.W.2d 681, 687 (Tex.App.-Houston [1 Dist.] 1992, orig. proceeding), it nevertheless does require that the communications be made for the purpose of obtaining spiritual guidance or consolation. Because there was evidence presented to the trial court indicating that the communications at issue were not motivated by any religious or spiritual considerations, we conclude the trial court could properly have found that [the accused priest's] statements were not addressed to [the priest] in his `professional character as a spiritual advisor.' See Tex.R. Evid. 505(b). Under these circumstances, we conclude the trial court did not abuse its discretion in (1) concluding the subject statements were not privileged under rule 505, and (2) admitting the evidence at trial."
15 S.W.3d at 640.
Here, the trial court was faced with the factual question of whether the documents were released to Archbishop Lipscomb in Archbishop Lipscomb's professional capacity as Zoghby's spiritual advisor or in the course of Archbishop Lipscomb's resolution of Ledet's complaint against Zoghby. Zoghby averred in his affidavit that he released the documents to Archbishop Lipscomb "to assist the Archbishop in giving [him] personal and spiritual guidance"; evidence offered by Ledet established otherwise. Archbishop Lipscomb's deposition testimony refutes Zoghby's statement. Archbishop Lipscomb's testimony established that before, during, and after the investigation into Ledet's complaint against Zoghby, he was not acting as Zoghby's spiritual advisor but as an investigator looking into Ledet's allegations and a resolver of her complaint. Indeed, Archbishop Lipscomb's testimony establishes that the counseling with Zoghby about his sexual misconduct was conducted in New York and that he used the documents from that counseling that Zoghby released to him as a major factor in deciding to promote Zoghby to the position of pastor. Zoghby does not deny that when he released the documents to Archbishop Lipscomb it was for the purpose of assisting Archbishop Lipscomb in determining whether Zoghby had "changed his life" and was ready to return to active ministry. Given the totality of the facts in this case, the trial court's conclusion that the privilege does not apply is supported by evidence indicating that the documents Ledet *326 seeks were released by Zoghby to Archbishop Lipscomb not for the purpose of Zoghby's receiving spiritual advice from Archbishop Lipscomb, but for the purpose of Zoghby's establishing his compliance with the Archdiocese's agreement with Ledet and his readiness to return to active ministry. Thus, Zoghby has not established that the trial court exceeded the scope of its discretion in this matter and has not established that he has a clear legal right to the relief requested.
Zoghby further argues that, even if his records are not protected by the clergyman privilege, the documents remain protected the psychotherapist-patient privilege because, he says, he did not "objectively manifest a clear intent not to rely on the [psychotherapist-patient] privilege." Ex parte United Serv. Stations, Inc., 628 So.2d 501, 505 (Ala.1993). See Ex parte Pepper, 794 So.2d 340 (Ala.2001); Ex parte T.O., 898 So.2d 706 (Ala.2004). Zoghby's argument, however, ignores the fact that he expressly released the documents to Archbishop Lipscomb. In his affidavit he admits that he signed "a release authorizing [his] counselor to send to and give the Archbishop access to [his] counseling records." As previously noted, nothing before us establishes that Zoghby did not intend for the documents to be used to assist in evaluating his readiness to return to active ministry. This express release, which the circumstances establish was for purposes other than counseling or treatment, objectively manifests Zoghby's clear intent not to rely on the psychotherapist-patient privilege. Therefore, Zoghby has not established that the trial court exceeded the scope of its discretion in holding that these documents are not protected from disclosure.
Lastly, the trial court's discovery order is tailored to protect the contents of these documents and to prevent unnecessary dissemination of what they contain. The order specifically provides that the documents are to be produced "solely for the purpose of discovery" and that the documents are bound from further disclosure by the parties' non-disclosure agreement. In light of the facts of this case, the trial court's restrictions adequately protect Zoghby's rights.

Conclusion
In light of the pleadings and facts before us, Zoghby has not established that the trial court exceeded the scope of its discretion in compelling the discovery. Consequently, Zoghby has not established a clear legal right to the relief requested; this petition therefore is denied.
PETITION DENIED.
NABERS, C.J., and SEE, HARWOOD, WOODALL, and BOLIN, JJ., concur.
LYONS, J., concurs specially.
PARKER, J., dissents.
LYONS, Justice (concurring specially).
I concur fully in the well-reasoned main opinion. I write specially to question the clarity of our precedent establishing the standards by which we review questions regarding the existence of a privilege as whether the trial court exceeded its discretion when it ruled on the privilege issue.
The main opinion cites Exxon Corp. v. Department of Conservation & Natural Resources, 859 So.2d 1096, 1103 (Ala.2002), in which this Court held that the standard for reviewing a trial court's ruling on a privilege issue is whether the trial court exceeded the scope of its discretion. In Exxon, we reviewed the trial court's ruling admitting a letter written by a corporate attorney and reversed the trial court's order finding a waiver of the attorney-client privilege based upon its conclusion that the letter had been distributed in a manner *327 inconsistent with confidentiality. Our analysis was fact intensive, as it should be, based upon Rule 104(a), Ala. R. Evid., which provides as follows:
"(a) Questions of Admissibility Generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of section (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges."
(Emphasis added.)
The main opinion's analysis is likewise fact intensive. Under the circumstances, if we were writing upon a clean slate I would prefer to apply as a standard of review whether the trial court's findings were clearly erroneous. Such an approach comports with treatment of the companion Rule 104(a), Fed.R.Evid. See, e.g., Bourjaily v. United States, 483 U.S. 171, 181, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). But, under our practice, when the trial court makes factual findings without benefit of live testimony, as was the case here, our review is de novo, not the more circumscribed scope of review where we affirm a judgment based on factual findings unless those findings are clearly erroneous. See Bentley Sys., Inc. v. Intergraph Corp., 922 So.2d 61, 70-71 (Ala.2005) ("In a case in which a trial court has not heard live testimony, this Court has held that `a reviewing court will not apply the presumption of correctness to a trial court's findings of fact and that the reviewing court will review the evidence de novo.' Eubanks v. Hale, 752 So.2d 1113, 1122 (Ala.1999). Our statutory [§ 12-2-7(1), Ala.Code 1975] obligation in a case such as this is to `weigh the evidence and give judgment as [we] deem[] just.'"). Perhaps we could merge the concepts by concluding that the trial court has not exceeded its discretion when its findings of fact are not clearly erroneous or when they survive de novo review. See, with respect to review for clearly erroneous factual finding, State v. Scholz, 432 A.2d 763, 766 (Me.1981), in which the court, applying the comparable Rule 104(a), Me. R. Evid., concluded: "We will not interfere with the court's exercise of its discretion unless we conclude, as in the case at bar, that those factual findings were clearly erroneous."
Regardless of whether the trial court's finding of absence of privilege in this proceeding is reviewed for an excess of discretion, reviewed by this Court de novo, or reviewed to determine whether the trial court's finding was clearly erroneous, the trial court's judgment is due to be affirmed for the reasons ably elaborated upon in the main opinion.
PARKER, Justice (dissenting).
Father Zoghby's counseling records from his treatment at a counseling clinic in New York state were originally protected by the psychotherapist-patient privilege. However, Linda Ledet, the plaintiff, contends that Father Zoghby waived that privilege when he consented to the release of those records to Archbishop Lipscomb, because, she asserts, the Archbishop's relationship to Father Zoghby was that of an investigator of her complaint and a supervisor, not a spiritual advisor. I respectfully disagree.
The clergy-parishioner privilege, long recognized and protected under the common law and by statute, was broadened substantially with the adoption of Rule 505(a)(2), Ala. R. Evid.:
"If any person shall communicate with a clergyman in the clergyman's professional capacity and in a confidential manner, then that person or the clergyman shall have a privilege to refuse to *328 disclose, and to prevent another from disclosing, that confidential communication."
As observed in Tankersley v. State, 724 So.2d 557, 560 (Ala.Crim.App.1998):
"Although § 12-21-166 [Ala.Code 1975] limited the clergyman privilege to communications that were either confessional or marital in nature, Rule 505 has explicitly broadened the scope of the privilege to include `all conferences where the clergyman is consulted in the professional capacity of spiritual advisor in the broadest sense.' Ala. R. Evid. 505, Advisory Committee's Notes."
Asked during deposition whether he had acted as Father Zoghby's spiritual advisor, Archbishop Lipscomb initially answered in the negative; he then, however, qualified his answer, saying that the term "spiritual advisor" is "very ambiguous" in the vocabulary of the Catholic Church. He went on to say in his deposition that he and Father Zoghby "discussed things that I thought were necessary for his healing" and that in his role as archbishop he had a duty to protect the victims of sexual misconduct by priests, and "[t]hen you try to deal with the perpetrator to see is he salvageable and what are the conditions under which you might approach a return to some kind of active ministry." He testified that he selected a program of counseling that involved Father Zoghby's living in a New York monastery and undergoing treatment at a nearby hospital, because he had hoped this treatment could rehabilitate Father Zoghby.
Father Zoghby says in his affidavit that Archbishop Lipscomb has served as his bishop and spiritual advisor, that he has entrusted many confidential matters to Archbishop Lipscomb over the years, and that he has had many private discussions with Archbishop Lipscomb concerning his spiritual growth and discernment.
All of this leads me to conclude that Archbishop Lipscomb was acting "in the clergyman's professional capacity" as Rule 505(b) requires for the clergyman privilege to apply and that he was a "spiritual advisor" to Father Zoghby "in the broadest sense" as explained in the Advisory Committee's Notes to Rule 505. Because of the rehabilitative purpose and nature of Church discipline, I do not believe Archbishop Lipscomb's roles here as investigator, supervisor, and spiritual advisor can be as neatly compartmentalized as the majority opinion implies.
Rule 505(b) limits the clergyman privilege to situations in which the person who made the communication has "communicate[d] with a clergyman in the clergyman's professional capacity and in a confidential manner." In any determination of whether Father Zoghby communicated with Archbishop Lipscomb "in a confidential manner," Father Zoghby's perception is critically important.
Because no clergy-parishioner case is directly on point, I shall cite analogous cases involving the parallel attorney-client privilege. In Tankersley, it was noted that the Advisory Committee's Notes to Rule 505(b) draw a comparison between the two privileges:
"[I]n defining which communications are confidential, the Advisory Committee's Notes compare the clergyman privilege and the attorney-client privilege: `The definition of the term [confidential] is consistent with its use in the attorney-client privilege.' Under Rule 502(d)(1), Ala. R. Evid., communications in which a client seeks the advice of an attorney for aid in the commission or furtherance of a crime are not privileged. Although Rule 505 does not contain a similar privilege covering communications with clergy that indicate an intention to commit a *329 crime, the Advisory Committee's Notes again draw a parallel with the attorney-client privilege: `Communications to the clergyman in furtherance of a crime or fraud would not qualify as seeking spiritual advice and therefore would not fall within the protection of the privilege.' Therefore, even though the clergyman privilege of Rule 505 does not specifically list exceptions to the general rule, the Advisory Committee clearly intended that the scope of that privilege would be comparable to the scope of the attorney-client privilege."
724 So.2d at 561.
As the United States Court of Appeals for the Seventh Circuit observed in Westinghouse Electric Corp. v. Kerr-McGee Corp., 580 F.2d 1311, 1319 n. 14 (7th Cir.1978)(quoting R. Wise, Legal Ethics 284 (1970)): "`The deciding factor is what the prospective client thought when he made the disclosure, not what the lawyer thought.'" Westinghouse also quoted McCormick on Evidence § 88, p. 179 (2d ed.1972), as saying that the attorney-client privilege "`hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice.'" 580 F.2d at 1319.
Other courts have held that "[i]n determining whether an attorney-client relationship has been created, the focus is on the putative client's subjective belief that he is consulting a lawyer in his professional capacity, and on his intent to seek professional advice." Dalrymple v. National Bank & Trust Co., 615 F.Supp. 979, 982 (W.D.Mich.1985). In United States v. Dennis, 843 F.2d 652, 657 (2d Cir.1988), the United States Court of Appeals for the Second Circuit said that the key is the "intent of the client" and whether he or she "reasonably understood" that the disclosure was to be confidential. Kevlik v. Goldstein, 724 F.2d 844, 849 (1st Cir.1984), held: "The guiding principle . . . is the intent of the client." Callas v. Pappas, 907 F.Supp. 1257, 1262 (E.D.Wis.1995), held that the attorney-client relationship arose when the putative client "reasonably believed" he was consulting with an attorney in the attorney's professional capacity. Herbes v. Graham, 180 Ill.App.3d 692, 699, 536 N.E.2d 164, 168, 129 Ill.Dec. 480, 484 (1989), held that cases involving the attorney-client privilege "focus on the client's viewpoint rather than that of the attorney." And in In re Anonymous, 655 N.E.2d 67, 70 (Ind.1995), the Supreme Court of Indiana held that an "important factor is the putative client's subjective belief that he is consulting a lawyer in his professional capacity. . . ."
In his affidavit, Father Zoghby clearly and unequivocally stated that he signed an authorization releasing his treatment records to Archbishop Lipscomb and to no other person, that he agreed to release the records to Archbishop Lipscomb in Archbishop Lipscomb's capacity as his bishop and his spiritual advisor, and that it was his clear understanding that the records were protected by the psychotherapist-patient privilege before the release and by the clergy-parishioner privilege after the release. These statements of Father Zoghby are unrefuted.
Because Archbishop Lipscomb acted in a "clergyman's professional capacity" and as Father Zoghby's "spiritual advisor in the broadest sense" and because Father Zoghby clearly and reasonably believed when he authorized the release of his records that these records were within the protection of the clergy-parishioner privilege, I believe the records are privileged under Rule 505(b). I further believe that, just as the attorney-client privilege is a deeply rooted common-law principle deemed essential to ensure the client's *330 right to effective representation of counsel, so also is the clergy-parishioner privilege a deeply rooted common-law principle deemed essential to protect the right of penitents to seek spiritual help and to preserve the integrity of the Church.
I therefore dissent.
NOTES
[1] Archbishop Lipscomb is the Archbishop of the Catholic Archdiocese of Mobile and acts as the administrative and spiritual head of the Archdiocese. Chancellor Farmer is the Chancellor of the Archdiocese and acts as an administrative and spiritual executive for the Archdiocese.